HUDSON VALLEY FREEDOM THEA-TER, INC., Plaintiff-Appellant,

v.

Louis HEIMBACH, individually and as the Orange County Executive; Peter Replogle, individually and as the Director of the Orange County Employment and Training Administration; June Cook, individually and as former Director of the Orange County Employment and Training Administration; Lawrence Gaskins, individually and as an employee of the Orange County Employment and Training Administration and the County of Orange, Defendants-Appellees.

No. 292, Docket 81–7425.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1981.

Decided Feb. 1, 1982.

William M. Kunstler, New York City (C. Vernon Mason, James I. Meyerson and Mark B. Gombiner, New York City, of counsel), for plaintiff-appellant.

James L. Fischer, New York City (Wilson, Elser, Edelman & Dicker, New York City, Herbert Dicker, New York City, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, FRIENDLY and PIERCE,* Circuit Judges.

* When this appeal was heard, Judge Pierce was a District Judge for the Southern District of New York, sitting by designation. He was in-

FRIENDLY, Circuit Judge:

This is an appeal from the dismissal by the District Court for the Southern District of New York for lack of standing of an action involving alleged violations of the civil rights laws, 42 U.S.C. §§ 1981, 1983, 1985, and 2000d, and the equal protection and due process clauses of the Fourteenth Amendment.[1]

The plaintiff, Hudson Valley Freedom Theatre, Inc. (HVFT), is a not-for-profit, tax-exempt corporation which was organized in 1972 and serves the Newburgh, New York area. There are no individual plaintiffs and HVFT explicitly affirms that it is suing solely on its own behalf. According to its complaint the purpose of HVFT is "to produce theatrical and artistic productions in Orange County and the Mid-Hudson area which particularly reach and involve the Black and Hispanic communities", and "which ... reflect the cultural needs, aspirations and creativity of the Black and Hispanic communities of the Mid-Hudson area." HVFT claims to have received financial support from a variety of public and private sources for this purpose and to have "earned and received substantial community support."

The defendants in the present action are the County of Orange and various of its present and past officials and administrators. Defendant Louis Heimbach is the County Executive of Orange County and, according to plaintiff, is responsible for the administration of the County's program under the Comprehensive Employment and Training Act, 29 U.S.C. § 801 et seq.

(CETA). Defendant Peter Replogle is the Director of Orange County's Employment and Training Administration (ETA), a county agency changed with administering the local CETA program. Also named as defendants are June Cook, Director of ETA at the time plaintiff's claims arose, and Lawrence Gaskins, an employee of ETA.

HVFT's claims are based principally upon two instances of alleged racially discriminatory conduct by the defendants. HVFT's primary allegation relates to its application to the Orange County ETA in the summer of 1978 for CETA funds for a project entitled "Expansion of the Theatre Arts Industry in the Greater Newburgh Community". This application, which sought some $188,-000 for "compilation of a theatre directory and production of eleven plays which would be performed by a touring troupe at area colleges, high schools and at other locations", was denied. The plaintiff, pointing to allegedly "improper, biased and perjurative [sic] comments" by defendant Gaskins on an ETA form rating the project, claims that ETA's denial was racially motivated. HVFT's further allegations focus on an alleged "series of actions [undertaken by defendants] which were designed to, and did in fact, discourage the HVFT's activity as a CETA sub-contractor." Plaintiff alleges, inter alia, that defendants "inordinately delayed" two of HVFT's previously approved ETA youth programs and discontinued two Title II Public Service Employment positions and a "restoration trainee" position in HVFT projects. Moreover, plaintiff alleges that various defendants made unfavorable public statements about HVFT and initiat-

---

ducted as a judge of this court on November 30, 1981.

1. Plaintiff also alleged disclosure by one of the defendants of confidential tax information in violation of I.R.C. §§ 6103 and 7213. The district court dismissed these allegations for failure to state a claim and plaintiff did not appeal.

In addition, plaintiff alleged that defendants wrongfully denied it funding in violation of "the regulations and directives promulgated [under the Comprehensive Employment and Training Act, 29 U.S.C. § 801 et seq. (CETA)] and agreements adopted pursuant thereto". The district court understandably was unclear whether plaintiff's claim was based on a breach of con-

tract theory or on violations of CETA. It dismissed the count, however, on the grounds that CETA does not provide a cause of action for damages against "prime sponsors", such as Orange County and plaintiff has not questioned that decision. The district court also held that, to the extent plaintiff's claim was based on a contract theory, the dismissal of plaintiff's other claims and the absence of diversity required dismissal of this common law claim. In light of our disposition of plaintiff's civil rights claims, the district court should reconsider whether pendent jurisdiction would permit resolution of plaintiff's contract claim.

ed inquiries into HVFT affairs, both "with the attempted purpose of discrediting" the theatre. Plaintiffs allege that these actions were motivated by racial animus.[2]

The district judge dismissed this portion of the complaint for lack of standing. Relying on language of the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), which we quote below, he reasoned that "a corporation, as a faceless creature of the state, may not assert claims of racial discrimination under the Fourteenth Amendment on its own behalf, and cannot be the 'target' of racial discrimination." Although a literal reading of one sentence in the *Arlington Heights* opinion indeed supports the judge's ruling, the sentence was of only academic importance and we do not believe that the Supreme Court would slavishly apply it so as to deny HVFT its day in court.

*Arlington Heights* involved a refusal by a village of that name, allegedly on racial grounds, to permit the rezoning from a single family to a multiple family classification of a tract on which Metropolitan Housing Development Corporation (MHDC), a non-profit corporation, proposed to construct racially integrated low and moderate income housing to be known as Lincoln Green. MHDC and three individuals seeking to represent a class of "low and moderate income minority-group members who work or desire to work in Arlington Heights but cannot find decent housing in Arlington Heights at rents they can afford", 373 F.Supp. 208, 209–10 (N.D.Ill.1974), brought an action asking declaratory and injunctive relief on the basis of the Equal Protection clause of the Fourteenth Amendment and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* The district court dismissed the com-

plaint primarily for failure to establish that the denial of the rezoning was racially motivated, 373 F.Supp. at 211, but the Court of Appeals, "proceeding in a somewhat unorthodox fashion," 429 U.S. at 271, 97 S.Ct. at 566, reversed on the constitutional claim, 517 F.2d 409 (7 Cir. 1975), without considering the statutory one; it held that disparate impact sufficed to establish a violation of the Equal Protection Clause. The Supreme Court reversed this constitutional holding.

The district judge in *Arlington Heights* had assumed that MHDC had standing, apparently on the basis of a ruling by a predecessor judge, see 373 F.Supp. at 209, and the question was not discussed in the opinion of the court of appeals. In the Supreme Court MHDC's standing was challenged. The Court first concluded that "there can be little doubt that MHDC meets the constitutional standing requirements." 429 U.S. at 261, 97 S.Ct. at 561. It had "shown an injury to itself that is 'likely to be redressed by a favorable decision.'" *Id.* at 262, 97 S.Ct. at 561, quoting from *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The Court refused to accept the Village's argument "that MHDC lacks standing because it has suffered no economic injury." 429 U.S. at 262, 97 S.Ct. at 561. MHDC had expended thousands of dollars for plans and studies many of which would be rendered useless if the denial of the requested rezoning were to stand. *Id.* Even more important, "[i]t has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing.... [MHDC's] interest in building Lincoln Green stems not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce." *Id.* at 262–63, 97 S.Ct. at 561–562. This was "not mere abstract concern about a problem

---

2. In July and November of 1978 HVFT complained to the Department of Labor, alleging that defendants had racially discriminated against it. The Department of Labor investigated plaintiff's charges and, in July 1979, informed HVFT that it had been "unable to substantiate [HVFT's] allegation of racial discrimination." It did direct, however, that two of the

HVFT positions abolished by the Orange County ETA should be restored and that HVFT's theatre arts project application should be re-evaluated. HVFT asserted that the Department's remedy was inadequate and sought money damages, which the Department indicated that it does not award.

of general interest." *Id.* at 263, 97 S.Ct. at 562, citing *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). "The specific project MHDC intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking." 429 U.S. at 263, 97 S.Ct. at 562, quoting from *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). "Clearly MHDC has met the constitutional requirements, and it therefore has standing to assert its own rights." 429 U.S. at 263, 97 S.Ct. at 562. This discussion reads directly on HVFT; indeed the district judge did not question that it had met constitutional standing requirements.

The *Arlington Heights* opinion went on to discuss the further "prudential" considerations required for standing. MHDC's rights, it continued, included the "right to be free of arbitrary or irrational zoning actions." *Id.* However, "the heart of this litigation has never been [such a] claim . . . . Instead it has been the claim that the Village's refusal to rezone discriminates against racial minorities in violation of the Fourteenth Amendment." *Id.* Then came the sentence here relied on by the defendants and the district court, *id.* :

> As a corporation, MHDC has no racial identity and cannot be the direct target of the petitioners' alleged discrimination.

But the Court did not leave the matter there. Dealing with what had in fact been MHDC's argument but is not HVFT's, namely, that it was entitled to assert *jus tertii,* the Court said, 429 U.S. at 263–64, 97 S.Ct. at 562:

> In the ordinary case, a party is denied standing to assert the rights of third persons. *Warth v. Seldin,* 422 U.S. at 499 [95 S.Ct. at 2205]. But we need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit MHDC to assert the constitutional rights of its prospective minority tenants. See *Barrows*

*v. Jackson,* 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586] (1953); cf. *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237 [90 S.Ct. 400, 404, 24 L.Ed.2d 386] (1969); *Buchanan v. Warley,* 245 U.S. 60, 72–73 [38 S.Ct. 16, 17, 62 L.Ed. 149] (1917). For we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own. (Footnote omitted).

The individual, one Ransom, was a black working in Arlington Heights and living 20 miles away, who testified that if Lincoln Green were built, he would probably move there.[3]

The Court therefore never did resolve the question of MHDC's standing, and the cases cited by it indicate that any resolution might well have been favorable. Moreover the entire discussion was in the context of the Fourteenth Amendment, whereas here the plaintiff seeks relief also on the basis of 42 U.S.C. § 2000d, which says that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The statute does not say "No person in the United States shall, on the ground of *his* race, color, or national origin" etc., and we perceive no reason to read it as if it did. *Arlington Heights* was scarcely meant to qualify the statement in *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), written by the same Justice, that in applying the prudential rules of standing, the question "is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." (Footnote omitted.) It is thus consistent with even a literal reading of the *Arlington Heights* opinion to hold that HVFT has met all standing requirements with respect to its statutory claim. Compare *Des Vergnes v. Seekonk Water District,* 601 F.2d 9, 13–14 (1 Cir. 1979).

---

**3.** It is worth noting that the argument that MHDC had standing to assert its own rights, in

contrast to the rights of potential tenants, received only the slightest mention in the briefs.

A further distinction of the sentence in *Arlington Heights* is that HVFT was established for the very purpose of advancing minority interests, whereas for MHDC this was simply an incidental, although important, by-product. It is not apparent why a corporation, although entitled to advance equal protection challenges based on inequality in taxation or regulation,[4] should lack standing to complain of discrimination because of its activities or stock ownership based on racial grounds—the core of the equal protection clause. At oral argument appellant's counsel posed the hypothetical of a city's denial of contracts to a construction company because it was owned by blacks. We agree in finding it hard to believe that the Supreme Court would deny standing to the corporation because it "has no racial identity and cannot be the direct target" of the discrimination, while at the same time it would be obliged to deny standing to the stockholders on the sound ground that the injury was suffered by the corporation and not by them. The principle that a corporation may assert equal protection claims when it alleges discrimination because of the color of its stockholders derives implicit support from *Fullilove v. Klutznick*, 448 U.S. 448, 455, 100 S.Ct. 2758, 2763, 65 L.Ed.2d 902 (1980), which entertained, without suggesting any question of standing, a complaint of "several associations of construction contractors and subcontractors, and a firm engaged in heating, ventilation, and air conditioning work" against § 103(f)(2) of the Public Works Employment Act of 1977, which amended Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. §§ 6701 *et seq.*, so as to require a 10% set-aside for minority business enterprises.[5] See also *T&S Associates, Inc. v. Crenson*, 505 F.Supp. 938 (D.R.I.1981) (suit by corporation and its sole shareholder, a black, under 42 U.S.C. §§ 1981, 1983 and 2000d for alleged racial discrimination in the award of a contract for the provision of school lunches; held that the shareholder did not have standing but that the corporation did).

When a corporation meets the constitutional test of standing, as HVFT admittedly does, prudential considerations should not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the corporation was founded to accomplish. Such recognition is supported by the indication in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), that one of the reasons for prudential limitations on standing is to obtain "the assurance that the most effective advocate of the rights at issue is present to champion them." HVFT is in a better position than anyone else to challenge discriminatory practices leading to cutting its grant funds. In addition, HVFT has a far more solid claim of injury in fact than would any resident who would have to allege an interest in attending as yet unannounced productions, or a prospective employee who might be only one of many that would seek to apply for positions not yet offered as a result of ETA's denial of the grant. It would indeed be paradoxical if prudential standing considerations were to limit the range of permissible plaintiffs in a case like this to those who would be re-

---

4. That a corporation is a "person" within the meaning of the Fourteenth Amendment was initially held in *Santa Clara County v. Southern Pacific R.R. Co.*, 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118 (1886), where the Court declined even to hear argument on the point. The Court adhered to this view in *Connecticut General Life Ins. Co. v. Johnson*, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938), over a dissent by Justice Black, *id.* at 85, 58 S.Ct. at 440, and in *Wheeling Steel Corp. v. Glander*, 337 U.S. 562, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949), over a dissent by Justices Douglas and Black, *id.* at 576, 69 S.Ct. at 1299.

5. See 448 U.S. at 478, 100 S.Ct. at 2774 (opinion of Burger, C. J.) ("ensur[ing] [minority] businesses . . . equal opportunity to participate in federal grants to state and local governments . . . is one aspect of the equal protection of the laws"); *id.* at 527, 100 S.Ct. at 2800 (Stewart, J., dissenting) ("The statute . . . bars a class to which the petitioners belong from having the opportunity to receive a government benefit, and bars the members of that class solely because of their race. . . . This is precisely the kind of law that the guarantee of equal protection forbids.").

quired to file complaints indulging in the sort of speculation which the Court has found suspect under its constitutional standing analysis. See *Warth v. Seldin, supra,* 422 U.S. at 502–08, 95 S.Ct. at 2207–2210. Thus, we predict that, despite the sentence in the *Arlington Heights* opinion, the Supreme Court would hold that HVFT has standing to assert claims of racial discrimination.

The judgment dismissing the complaint on the ground of HVFT's lack of standing to raise questions under the Equal Protection clause and 42 U.S.C. § 2000d is reversed and the cause is remanded for further proceedings consistent with this opinion.

PIERCE, Circuit Judge (concurring):

I concur with the majority in its holding that Hudson Valley Freedom Theater, Inc. ("HVFT"), albeit a corporate entity, has standing to sue when, as a result of conduct based upon allegedly racially discriminatory intent, it is thwarted in performing "specific acts of the sort which the corporation was founded to accomplish." *Ante,* at 706. I would prefer to reach that result, however, by a somewhat different path.

As the majority points out, HVFT has alleged that defendants' actions have (1) caused it economic injury and (2) frustrated its attempts to fulfill its corporate purposes. Thus, it has made the allegations of "demonstrable, particularized injury" required by *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). Since it has alleged that it " 'personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, ——, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted), HVFT's claim is not barred by either constitutional or prudential limitations as to standing.

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court stated conclusively that "a corporation ... has no racial identity and cannot be the direct target of the ... alleged discrimination." 429 U.S. at 263, 97 S.Ct. at 562. While this statement was not necessary to the holding in that case, it does reflect the Supreme Court's view on the narrow issue of whether a corporation can itself be considered to have a racial character.[1] However, I agree with the majority that this statement does not preclude HVFT from maintaining this action merely because it is a corporation. As the majority points out, the *Arlington Heights* Court continued its discussion and stated that it did not need to decide whether the corporate plaintiff might have standing to "assert the constitutional rights of its prospective minority tenants. See *Barrows v. Jackson,* 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586] (1953); cf. *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237 [90 S.Ct. 400, 404, 24 L.Ed.2d 386] (1969); *Buchanan v. Warley,* 245 U.S. 60, 72–73 [38 S.Ct. 16, 17, 62 L.Ed. 149] (1917)." 429 U.S. at 263–64, 97 S.Ct. at 562.

I believe that, in spite of the Court's reference to *jus tertii* principles in *Arlington Heights,* the citation of *Barrows, Sullivan,* and *Buchanan* is of broader significance with respect to HVFT's standing, quite apart from the issue as to whether a corporation does or does not have a racial identity. Like the First Circuit in *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir. 1979), and this Circuit in *DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, *modified,* 520 F.2d 409 (2d Cir. 1975), I read *Sullivan, supra,* as standing for the proposition that in order to invoke the protection of 42 U.S.C. § 1981 "one need not be a member of the racial class protected by the statute and one need not even be able

---

1. A different result no doubt would obtain when there is legislation that explicitly addresses the matter. *See, e.g.,* 42 U.S.C. § 6705(f)(2).

to identify any specific member of the class who suffered or may suffer discrimination." 601 F.2d at 14.

Section 5 of the 14th Amendment gives Congress the power to enact legislation in order to enforce the provisions of that amendment. It was under this authority and with this purpose that Congress enacted, *inter alia*, 42 U.S.C. §§ 1981, 1983, 1985 and later 2000d. In *The Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 72, 21 L.Ed 394 (1873), the Supreme Court stated that "in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all [the 13th, 14th and 15th], the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it." This purpose, as later interpreted, was to assure the common enjoyment of civil rights to all persons regardless of race.[2] *Buchanan v. Warley, supra*, 245 U.S. at 76, 38 S.Ct. at 18; *The Slaughterhouse Cases, supra*, 83 U.S. at 72. In *Barrows, supra*, 346 U.S. at 257, 73 S.Ct. at 1035, *Buchanan, supra*, 245 U.S. at 78, 38 S.Ct. at 19, and *Sullivan, supra*, 396 U.S. at 237, 90 S.Ct. at 404, the Court pointed out that this aim cannot be accomplished if a white person could be "punished for trying to vindicate the rights of minorities," 396 U.S. at 237, 90 S.Ct. at 404, and then could be held to be without standing to sue. Further, any such "narrow construction of the language of [the relevant civil rights statutes] would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded...." *Id.* at 237, 90 S.Ct. at 404. *See also DeMatteis v. Eastman Kodak Co., supra*, at 312. That being so, I would hold that under the 14th Amendment and the statutes which seek to implement its purposes, *any person*, including a colorless corporate "person", although not a member of a protected group, has an implied cause of action against any other person who, with racially discriminatory intent, causes him (or it) direct injury. *See Des Vergnes v. Seekonk Water Dist., supra*, at 14; *cf. Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977); *Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108, 112 (2d Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).

The burden will be upon HVFT to establish in the district court its contention that defendants' denial of the funds it has requested caused it injury in light of its corporate purposes and that, in addition, this was motivated by racial animus.[3]

In light of the above, whether HVFT, as a corporation, does or does not have a racial identity is irrelevant, and I see no need to predict how the Supreme Court might rule if directly confronted with the issue.

---

**2.** Although the original purpose of the 14th Amendment was to protect the civil rights of black persons, it was recognized very early that its protections would extend to members of other minority groups. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *The Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 72, 21 L.Ed. 394 (1873).

**3.** The required animus and discriminatory intent could be the result of, among other things, plaintiff's entering into contracts with minority group members (*see, e.g., Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Des Vergnes v. Seekonk Water District*, 601 F.2d 9 (1st Cir. 1979); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, *modified*, 520 F.2d 409 (2d Cir. 1975)); plaintiff's advocating the protection of the rights of minority group members (*see, e.g., Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1953); *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266 (6th Cir. 1977)); ownership of a plaintiff corporation by minority group members (*see, e.g., T&S Associates, Inc. v. Crenson*, 505 F.Supp. 938 (D.R.I.1981)); or, as alleged here, plaintiff's attempt to serve the cultural interests of minority group members.