**THINKET INK INFORMATION RESOURCES, INC., Plaintiff– Appellant,**

v.

**SUN MICROSYSTEMS, INC., Defendant–Appellee.**

No. 02–16754.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed May 17, 2004.

Raymond P. Bolaños, Redwood City, CA, for the appellant.

David Fallek; Alfred Pfeiffer, Jr., Neha Nissen, Bingham McCutchen LLP, San Francisco, CA, for the appellee.

Before: TASHIMA, THOMAS, and SILVERMAN, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal, we consider the question, *inter alia,* of whether a corporation has standing to commence an action under 42 U.S.C. § 1981. We hold that if a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981. We affirm the judgment of the district court in part, vacate in part, and remand.

I

Thinket Ink Information Resources, Inc. ("Thinket") is a minority-owned technology services contractor certified by the United States Small Business Administration ("SBA") as a firm owned and operated by socially and economically disadvantaged individuals, eligible to receive federal contracts under the SBA's "Section 8(a)" business development program. 15 U.S.C. § 637(a) (2000); 13 C.F.R. § 124. Each of Thinket's shareholders is an African–American, including plaintiff Ralph Jackson, who is the corporation's majority shareholder.

In June 1992, Thinket began providing Sun Microsystems, Inc. ("Sun") with systems support services at Sun's facility in Fremont, California, contracting through individual purchase orders. In an attempt to substantially increase its business with Sun, Thinket commenced a concerted effort in 1993 to become a supplier to Sun under a Master Service Agreement ("MSA"), which is a contract Sun offers to its preferred vendors. Sun characterizes its MSA arrangement as a form of a requirements contract, under which one party agrees to supply and the other party agrees to purchase all the specific goods or services that the other party may require during a certain period at an agreed price.

According to Thinket's complaint, its application for an MSA was denied three times without explanation, despite Sun's alleged acknowledgment that Thinket's work was very good.

In December 1994, Thinket was successful in obtaining an MSA with Sun. The MSA at issue is titled "Master Services Agreement # 1477–1295" and provides in relevant part that:

Sun may, from time to time, by issuance of a purchase order request that Thinket provide to Sun the services of Thinket's employees on a temporary basis to perform work for Sun at such times and places and in such manner as Sun may designate.... The Services shall conform to the scope of work ... described in the purchase order(s) issued by Sun from time to time.

The MSA also provided for arbitration, specifically stating:

[a]ny and all disputes or controversies whether of law or fact of any nature whatsoever arising from or respecting this Agreement shall be decided by binding arbitration by the American Arbitration Association, (A.A.A.), in accordance with the Commercial rules and regulations of such Association.

Two additional contracts were entered into by the parties after they had entered into the MSA, namely: Services Agreement # 1461–0995 and Services Agreement # 1461–0696. These agreements do not contain the binding arbitration clause contained in the MSA but rather each contains the identical jurisdictional provision stating that:

The parties agree that the exclusive jurisdiction and venue of any action between the parties rising [sic] out of this Agreement, including disputes that may arise following termination of this Agreement, shall be the Superior Court of California for the County of Santa Clara, or the United States District Court for the Northern District of California, and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such courts for purpose of such action.

Sun signed "Services Agreement # 1461–0995" on October 7, 1994; Thinket did not sign the agreement until March 24, 1995. In the interim, that contract was amended via a one-page document titled "Master Services Agreement # 1461–0995 Amendment" which was signed by Sun on March 15, 1995 and by Thinket on March 20, 1995. Although the words "Master Services Agreement" appear in the Amendment to 1461–0995, both the amendment and the original document (which does not contain those words) refer exclusively to specific services, unlike the MSA.

The relationship soured, and Thinket filed this action against Sun under various legal theories alleging that Sun had deliberately refused to contract with Thinket based solely on its status as an African–American owned business. Sun responded by filing a motion to dismiss under Fed. R.Civ.P. 12(b)(6).

In response, the district court held that Thinket's pre-MSA claims were time-barred. As to the claims arising out of the MSA, the district court stated:

The Court finds that each of the subsequent Service Agreements referred to by plaintiffs relates only to a single service order or deliverable to be provided by Thinket; they are not agreements which supersede or displace the original Master Services Agreement entered into by the parties.... The complaint makes no allegations that any particular contract for work was breached by Sun. Thus, [the Services Agreements] are not directly related to the claims made in plaintiffs' complaint.

With that finding, the district court compelled the arbitration of the claims arising

under the MSA. The district court dismissed Jackson's claims for lack of standing, but granted him leave to amend. Thinket and Jackson sought permission to file a motion for reconsideration, which the district court denied. The district court granted Jackson additional time in which to file an amended complaint. However, he never did so, and the district court entered judgment against him.

Thinket appealed the order of dismissal, the reconsideration order, and the judgment. Sun filed a motion to dismiss the appeal on the ground that Thinket had not arbitrated its MSA-related claims. A panel of this Court then dismissed the appeal for lack of appellate jurisdiction. The case ultimately proceeded through arbitration, resulting in the eventual entry of a stipulated amended judgment in district court. Thinket now appeals from the amended judgment.

## II

A threshold question is whether Thinket, as a corporation, has standing to assert discrimination claims under § 1981. "At the most general level, '[the standing] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.,* 219 F.3d 895, 899 (9th Cir.2000) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "Together, the constitutional and prudential components of standing ensure that plaintiffs possess 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1109 (9th Cir.2003) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

■ "Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2." *Pershing Park Villas,* 219 F.3d at 899. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

There is no dispute that Thinket possesses constitutional standing. It alleges a concrete and particularized harm traceable to the defendant. If successful in its claims, its injury would be redressed by a damage award. Thus, Thinket satisfies the prerequisites of Article III standing.

■ In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Among these prudential requirements is the requirement that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315,

82 L.Ed.2d 556 (1984)). Thus, we must address whether Thinket's claim is within the zone of interests protected by § 1981.

■ The issue of whether corporations could assert § 1981 claims was cast into doubt by dictum in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), in which Justice Powell observed that "as a corporation, [the plaintiff] has no racial identity and cannot be the direct target of the petitioners' alleged discrimination."[1] *Id.* at 263, 97 S.Ct. 555.

While accepting this anti-anthropomorphic truism as a general proposition, courts following *Arlington Heights* have determined that under some circumstances corporations have satisfied the prudential standing requirements to assert § 1981 claims. For example, in *Des Vergnes v. Seekonk Water District*, 601 F.2d 9 (1st Cir.1979), the First Circuit acknowledged the language in *Arlington Heights*, but granted a corporate plaintiff third-party standing to litigate its race discrimination claim. The First Circuit held that the corporation had "an implied right of action against any other person who, with a racially discriminatory intent, interferes with its right to make contracts with non-whites." *Id.* at 13–14. Similarly, in considering a direct discrimination claim, the Second Circuit held that a corporation suing on its own behalf had standing to assert claims of racial discrimination in the disbursement of grant funds. *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir.1982). Judge Friendly's opinion for the court found the *Arlington Heights* language to be only of "academic importance" and indicated that the court did "not believe that the Supreme Court would slavishly apply it so as to deny [the Theater] its day in court." *Id.* at 704. The Second Circuit surmised that if the individual plaintiff in *Arlington Heights* had not existed, the Supreme Court would have granted corporate standing. *Id.* at 706. Whether or not that specific prediction was correct, of course, cannot be determined. The prediction is at least moderately bolstered, however, by the fact that the Supreme Court later implicitly recognized that corporations can have racial characteristics by allowing white owned corporations to challenge contractor set asides on reverse discrimination grounds. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Regardless, we find *Heimbach's* analysis particularly apposite for present purposes, where the district court dismissed individual plaintiff Jackson's claims because the injury was suffered by the corporation. Addressing just such a scenario, the Second Circuit stated:

> We agree in finding it hard to believe that the Supreme Court would deny standing to the corporation because it has 'no racial identity and cannot be the

---

**1.** In *Arlington Heights*, the Supreme Court held that the corporation had standing because it had suffered injury and had a "right to be free of arbitrary or irrational zoning actions." 429 U.S. at 263, 97 S.Ct. 555. After making the observation concerning racial identity of corporations, Justice Powell then stated that "we need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit [the corporation] to assert the constitutional rights of its prospective minority ten-

ants.... For we have at least one individual plaintiff who has demonstrated standing to assert these rights on his own." *Id.* Thus, the statement was clearly dictum. However, we have long adhered to the practice that "Supreme Court dicta is not to be lightly disregarded," *Laub v. United States Dep't of Interior*, 342 F.3d 1080, 1090 n. 8 (9th Cir.2003), and that it must be treated with "due deference." *United States v. Baird*, 85 F.3d 450, 453 (9th Cir.1996).

direct target' of the discrimination while at the same time it would be obliged to deny standing to the stockholders on the sound ground that the injury was suffered by the corporation and not them. *Id.* at 705–06, 109 S.Ct. 706.

 In circumstances such as this, a corporation has acquired an imputed racial identity sufficient to take it out of the general observation about corporations made by Justice Powell in *Arlington Heights.* To receive certain governmental benefits, Thinket was required to be certified as a corporation with a racial identity; further, it alleges that it suffered discrimination because all of its shareholders were African–American. This is quite different from the situation posed in *Arlington Heights* where the corporate plaintiff had no particular racial identity. In *Arlington Heights,* Justice Powell held open the possibility that particular circumstances "would justify a departure from [the] prudential limitation" that he expressed. 429 U.S. at 623, 97 S.Ct. 861. When a corporation has acquired a racial identity, either as a matter of law or by imputation, then it can be the direct target of discrimination and has standing to pursue a claim under § 1981. Thus, under those circumstances, a departure from the *Arlington Heights* prudential limitation is warranted.[2]

In addition, the prudential "zone of interest" test, as the Supreme Court has observed, is "not meant to be especially demanding." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). "Prudential standing is satisfied unless [the party's] 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"

*Ocean Advocates v. United States Army Corps of Eng'rs,* 361 F.3d 1108, 1121 (9th Cir.2004) (quoting *Clarke,* 479 U.S. at 399, 107 S.Ct. 750). Thus, we have held that prudential standing exists for nonprofit corporations to file actions based on injuries associated with their members. *See, e.g., id.* at 1120–21; *Oregon Advocacy Ctr.,* 322 F.3d at 1109. Under the prudential standing doctrine of associational standing, an association satisfying the proper prerequisites may "sue to redress its members' injuries, even without a showing of injury to the association itself." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

However, applying the associational standing model in the for-profit context ordinarily would not be appropriate. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). "In general, shareholders lack standing to assert an individual § 1983 claim based on harm to the corporation in which they own shares." *RK Ventures, Inc. v. City of Seattle,* 307 F.3d 1045, 1057 (9th Cir.2002). Thus, a for-profit corporation would not, in the usual case, be able to satisfy the first prong of the traditional associational standing test.

---

**2.** It is also significant that courts have imputed personal characteristics to corporations in other contexts. For example, we have long allowed criminal intent to be imputed to corporations. *See, e.g., Magnolia Motor & Logging Co. v. United States,* 264 F.2d 950, 954 (9th Cir.1959).

■ However, we need not reach as far as the associational standing doctrine, nor analyze its precise contours in the for-profit corporate setting, to determine zone of interest standing in the present context. The corporate plaintiff here alleges direct racial discrimination based on its status as an SBA-certified minority-owned business and the race of its shareholders. Those allegations easily bring the corporation within the "zone of interest" protected by § 1981. As the D.C. Circuit observed in *Gersman v. Group Health Ass'n*, 931 F.2d 1565 (D.C.Cir.1991), *vacated on other grounds*, 502 U.S. 1068, 112 S.Ct. 960, 117 L.Ed.2d 127 (1992):

> In our view, however, the determination whether a corporation has a racial identity is not determinative of whether that corporation has standing to bring a discrimination claim. Rather than assume that racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm.

*Id.* at 1568. Thus, as an independent standing rationale, when a corporation experiences direct discrimination injury, it falls within the prudential zone of interest protected under § 1981. Here, the corporation has alleged such an injury.

In summary, we join our sister circuits in holding that if a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981.[3]

### III

■ The district court did not err in compelling arbitration of the claims filed under the MSA, a decision we review *de novo*. See *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 n. 2 (9th Cir.), *cert. denied*, 535 U.S. 1112, 122 S.Ct. 2329, 153 L.Ed.2d 160 (2002). The record clearly supports the district court's conclusions that the post-MSA claims were subject to arbitration.

■ Nor did the district court err in dismissing the plaintiffs' claims that were subject to arbitration pursuant to Fed. R.Civ.P. 12(b)(6). See *Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723–725 (9th Cir.2000). Although the Federal Arbitration Act "provides for a stay pending compliance with a contractual arbitration clause ... a request for a stay is not mandatory." *Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.*, 586 F.2d 143, 147 (9th Cir.1978). Thus, the district court properly entertained the dismissal motion.

### IV

Based on the precedent existing at the time of adjudication, the district court also correctly dismissed the pre-MSA claims as time-barred. "California's one-year statute of limitations for personal injury actions governs claims brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1985." *Taylor v. Regents of University of California*, 993 F.2d 710, 711 (9th Cir.1993). Because the pre-MSA claims accrued more than one year prior to the filing of the suit, the district court properly determined that the statute of limitations barred their assertion.

■ However, in considering this issue, the district court was without the benefit of the Supreme Court's recent decision in *Jones v. R.R. Donnelley & Sons Co.*, —— U.S. ——, 124 S.Ct. 1836, —— L.Ed.2d

---

**3.** The corporate plaintiff does not assert third party standing in this case, as the plaintiff corporation did in *Arlington Heights*. Thus, it is unnecessary for us to reach that question or determine the contours of corporate third party standing under § 1981.

—— (2004). In *Jones*, the Court held that the statute of limitations for a cause of action brought under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, was governed by the four-year statute of limitations set forth in 28 U.S.C. § 1658(a) rather than by the personal injury statute of limitations of the forum state. *Id.* at 1845. The Court held that "a cause of action aris[es] under an Act of Congress enacted after December 1, 1990—and therefore is governed by § 1658's four-year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post–1990 enactment." *Id.* The 1991 amendment to § 1981 added the subsection defining the statute's "make and enforce contracts" language to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The pre-MSA claims in *Thinket* date to January, 1993 and December, 1994. Thinket filed the action at issue in January, 1997. Consequently, while Thinket's § 1981 claims thus fell outside the one-year California limitations period, they were within the four-year period provided for by 28 U.S.C. § 1658—if, in fact, the claims were made possible by the 1991 amendment. We reserve that question for the district court's consideration in the first instance. Thus, while we find that the district court did not err in its analysis, we vacate the portion of its decision finding Thinket's pre-MSA § 1981 claims to be time-barred and remand to the district court in order that it might consider the claims in light of the Supreme Court's decision in *Jones*.

## V

■ Finally, the district court did not err in dismissing the action without leave to amend. Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could

not be saved by any amendment. *See Eminence Capital LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003). However, "[a] district court does not err in denying leave to amend where the amendment would be futile." *Saul v. United States,* 928 F.2d 829, 843 (9th Cir.1991). Here, based upon a thorough review of the record, it is clear that granting leave to amend would have been futile. The fact that the district court did not so state specifically is not a basis to reverse the district court. *See Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 772 (9th Cir.1991) (noting that a "district court may decline to grant such leave ... where there is any *apparent or declared* reason for doing so, including ... the futility of the amendment." [internal quotations omitted; emphasis in original]).

Given the potential impact of *Jones* on this case, and in light of our remand to the district court, we save for the district court the determination of whether Thinket should now be granted leave to amend its complaint.

The judgment of the district court is **AFFIRMED IN PART** and **VACATED IN PART,** and this case is **REMANDED** to the district court for consideration in accordance with this opinion. Each party shall bear its own costs on appeal.