NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0074n.06

No. 17-4281

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| B&S TRANSPORTATION, INC., an Ohio Corporation; RONNIE HARRIS, an Individual, | ) ) ) | **FILED** Feb 13, 2019 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, a Delaware LLC; BRIDGESTONE AMERICAS, INC., a Nevada Corporation, | ) ) ) ) ) | COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Defendants-Appellees. | ) | |

Before: SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Defendants Bridgestone Americas Tire Operations, LLC and Bridgestone Americas, Inc. (collectively, Bridgestone) ended a dealership agreement with plaintiff B&S Transportation, Inc. B&S and its president and principal shareholder, Ronnie Harris, sued Bridgestone, alleging that the termination constituted intentional race discrimination contrary to 42 U.S.C. § 1981. The district court granted summary judgment to Bridgestone, concluding that B&S could establish neither a prima facie case of race discrimination nor that Bridgestone's legitimate, non-discriminatory reason for terminating the dealership agreement was pretextual. We AFFIRM.

I.

Plaintiff Ronnie Harris and his wife are the sole shareholders of B&S. The amended complaint describes B&S as "an African-American owned and operated corporation and a [m]inority owned business [which] is known as such throughout the country." B&S became an authorized dealer of Firestone tires in the late 1970s. Then, in the early 1990s, after Bridgestone acquired Firestone, B&S and Bridgestone entered into a dealership agreement. The agreement allowed B&S to pursue "minority set-aside business,"[1] although B&S was not restricted to pursuing such business. Because it was pursuing minority set-aside business, B&S "receive[d] certain advantages that . . . other dealers d[id not] have." For example, B&S did not have to provide service and warranty work, and Bridgestone agreed to ship tires directly to B&S customers (known as drop-shipping), which saved B&S the cost of shipping. The agreement specified, however, that "[i]t must be understood that these advantages are to be used only to obtain incremental business for us and to genuinely assist your minority enterprise, and not to disrupt our existing distribution system by merely displacing sales which would otherwise be made by our current dealers or by Bridgestone itself." The agreement could be terminated by either party, without cause, with thirty days' written notice.

From 1991 to 2013, B&S operated under the agreement as a "tire broker," purchasing tires from Bridgestone and selling them to customers. B&S had no retail storefront and did not offer tire-related services, such as service or warranty work. Instead, B&S's business model was to broker tires by phone and computer.

---

[1] A letter sent by the executive director of Bridgestone's sale operations at the time the parties entered into the dealership agreement defined "minority set-aside business" as "the quota of passenger tires, light truck tires and truck tires reserved by federal, state, county, city governments and their respective agencies, public school districts and by public utilities for purchase from businesses that are owned and operated by individuals who are members of a minority."

In February 2013, Bridgestone ended the business relationship with B&S by letter. The letter stated that "Bridgestone's reasons for termination include[] Bridgestone's change in distribution and go to market solutions strategies." Although the parties' agreement allowed termination with thirty days' notice, the letter permitted B&S to continue to operate as a dealer until December 31, 2013.

B&S sued Bridgestone, claiming that Bridgestone's discontinuation of the dealership agreement was an intentional act of race discrimination in violation of 42 U.S.C. § 1981. B&S also asserted various state law claims. Bridgestone counterclaimed, arguing, among other things, that B&S owed it nearly $1 million for tires purchased on credit. After discovery, both parties moved for summary judgment. The district court granted summary judgment in favor of Bridgestone on B&S's race discrimination claim and dismissed B&S's remaining state law claims and Bridgestone's counterclaims without prejudice. The court concluded that B&S could not establish the fourth element of a prima facie claim of race discrimination because it had not identified a valid comparator. In the alternative, the court concluded that Bridgestone had offered a legitimate, non-discriminatory reason for ending the agreement with B&S: that B&S's dealership model was not aligned with Bridgestone's current distribution and marketing strategy. B&S could not meet its burden of showing that Bridgestone's reason was pretextual.

B&S moved for reconsideration. The district court granted B&S's motion but adhered to its original decision. B&S timely appealed to this court.

## II.

B&S's race-discrimination claim under 42 U.S.C. § 1981 is based on circumstantial evidence, which means we follow the *McDonnell Douglas-Burdine* test. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Assuming for purposes of this appeal that B&S can establish a prima facie case of race discrimination,[2] the burden shifts to Bridgestone to articulate a legitimate, non-discriminatory reason for having terminated the dealership agreement. *Id.* at 573. B&S admits that Bridgestone's stated reason— that B&S's business model was not aligned with Bridgestone's current distribution and marketing strategy—satisfies that burden. To prevail, then, B&S "must produce sufficient evidence from which a jury could reasonably reject" Bridgestone's explanation, *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009), and conclude instead "that the proffered reason was actually a pretext to hide unlawful discrimination," *Johnson*, 215 F.3d at 573. B&S may do so by showing that Bridgestone's stated reason "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain [Bridgestone's] action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

Kurt Danielson, president of Bridgestone's United States and Canada commercial tire sales division, explained Bridgestone's reason for discontinuing the dealership agreement with B&S. According to Danielson, Bridgestone "has, over the past few years, elected to move toward a more

---

[2] Bridgestone does not challenge either B&S's or Harris's ability to bring suit under § 1981. We note, however, that the Supreme Court has held that a shareholder may not maintain a § 1981 discrimination claim where he lacks rights under the contract that are independent of the corporation. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006). The Supreme Court has not decided, however, whether, or under what circumstances, a corporation may sue for race discrimination under § 1981. *See id.* at 473 n.1. It does not appear that this circuit has resolved the question but, analyzing the question as one of prudential standing, at least one other circuit has held that corporations may bring such a claim. *See, e.g.*, *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1055 (9th Cir. 2004) (concluding "that if a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981"). The Supreme Court has since clarified that the zone of interests inquiry is properly understood as asking whether a particular plaintiff "has a cause of action under the statute," and is not jurisdictional. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). Accordingly, we do not address this question here.

service-oriented product delivery model," and as part of that strategy, Bridgestone "has emphasized the importance of its dealers' ability to provide customers with a full complement of tire-related services, including, but not limited to, in-shop and field tire services, as well as vehicle maintenance and repair, fleet service, tire disposal, and tire-retreading services." This change in market strategy was documented through both internal Bridgestone presentations and publicized media reports. Danielson elaborated:

> Among other reasons, this evolution in distribution and go-to-market sales strategy is necessary because, as customers gain increased access to price information through the internet and other channels, there is some tendency for [Bridgestone] customers and potential customers to view tires as an interchangeable commodity, decreasing profit margins for [Bridgestone] and its dealers. [Bridgestone's] ability to provide a full complement of "wrap around" tire-related services affords [Bridgestone] a competitive edge in the marketplace. Over time, [Bridgestone] has seen opportunities for greater customer loyalty and increased profits in the ability to provide a full complement of tire-related services to customers. And those services can best be provided through [Bridgestone's] vast network of affiliated dealers. The dealer network works best if it is unified and coordinated, with dealers who have the ability and willingness to interact with and serve customers in multiple, diverse ways.

Danielson explained that Bridgestone terminated B&S's dealership agreement because "B&S's business model, under which B&S functioned essentially as a tire broker rather than a service-oriented dealer, was inconsistent with [Bridgestone's] strategies for the marketing and sale of tires through its network of affiliated dealers." He noted that, "B&S brokered tires across territories while using competitive advantages—like drop shipping—to win bids over other dealers with substantial investments in full-service operations." According to Landers Gaines, manager of government and military sales for Bridgestone, "B&S did not provide many, if any, tire-related services."

B&S does not dispute this characterization of its business but argues that Bridgestone's explanation fails to justify the termination. B&S posits that "[a] change in market strategy to focus on servicing rather than pure sales is easy to grasp, but it is hard to understand how that would best

be effectuated by *terminating dealers* rather than simply requiring each dealer to meet certain goals or standards relating to servicing." Furthermore, says B&S, "it is hard to see how an *unannounced* termination was preferable to providing advance notice of Bridgestone's expectations, and an opportunity to meet them, prior to terminating" the agreement.

But the testimony shows that Harris had not been receptive to the idea of transforming B&S into a service dealer. Danielson testified that, when deciding to discontinue the relationship with B&S, Bridgestone considered that "our distribution has been moving to service" and Harris "wasn't changing his business model the way most of our dealers were changing the business model." Gaines testified that he had previously spoken to Harris about developing the capability to offer tire-related services, noting that he "tried to get [Harris] to do more than broker tires." Gaines said that he and Harris talked about various ways for Harris to expand his business, including retreading, servicing trucks, or doing more off-road business, or participating in more programs offered by Bridgestone. But Harris, who "had a history of his business not expanding," was not interested. Gaines testified that, during a meeting to decide whether to terminate B&S's dealership agreement, he and other Bridgestone employees discussed whether Harris "would change how he does business with us and would he be open to other avenues"; Gaines told the others that "from my dealings with him he wasn't open to other avenues." B&S does not rebut this testimony and, instead, acknowledges on appeal that "Bridgestone *did* discuss with Plaintiffs the subject of changing B&S's business model to be able to perform services—in other words, to conform to the alleged market strategy."

Still, B&S argues, Bridgestone never demanded that B&S grow its sales or perform services on pain of losing its dealership agreement. Gaines did testify that, although he had "suggested to B&S numerous opportunities for them to expand their sales[,] [i]t was never a

requirement." But the question is not whether it would have been more reasonable for Bridgestone to have given B&S one last chance, or even any chance at all, to adapt before deciding whether to continue the arrangement. *Cf. Plona v. United Parcel Serv., Inc.*, 558 F.3d 478, 482 (6th Cir. 2009). Under the terms of the agreement, Bridgestone was free to end the agreement at will with only thirty days' notice. The pretext question asks only whether there is evidence from which a reasonable jury could conclude that Bridgestone did not terminate the agreement because of B&S's poor fit with its changing market strategy, but instead because of race. *See Johnson*, 215 F.3d at 573. Given the unrebutted testimony demonstrating both that Bridgestone's strategy did change and that Harris had previously been reluctant to adapt to it, we find no such evidence here.

Having failed to show that pretext lurks in Bridgestone's failure to give B&S more time to adapt to the changed market strategy, B&S next argues the reverse—that a jury could reasonably infer pretext from Bridgestone's *delay* in ending the agreement. According to B&S, Bridgestone never explained why it waited until 2013 to discontinue the dealership agreement when its change in market strategy began in 2007. But, as is not uncommon, Bridgestone did not complete its change in market strategy overnight. Danielson's affidavit confirms that the shift to a service-dealer market strategy was ongoing in late 2012, shortly before Bridgestone terminated its agreement with B&S. Given that Bridgestone employees had previously discussed the market strategy shift with Harris, with the goal of having B&S adapt to it, we find it of little significance that Bridgestone did not immediately terminate the dealership agreement once it began its shift in market strategy.

B&S next says that the results of Bridgestone's changed market strategy should arouse suspicion. B&S claims that it was the only dealership out of 1,300 that Bridgestone terminated for not fitting with the market strategy. For this assertion, B&S relies on Bridgestone's response

to B&S's request to "[a]dmit that during the period from March 1, 2013 to the present [Bridgestone] did not terminate any non-Black owned dealership for the same grounds and reasons stated in the February 28, 2013 Termination Letter." After stating various objections to the request, Bridgestone replied, "Subject to and without waiving these objections, Defendants admit that no other such dealership agreements were terminated for exactly the same reasons underlying B&S's termination as an authorized [Bridgestone] dealer."

While it may be true that B&S was the only dealership terminated for precisely the same reason as B&S—that its unique tire broker business model did not fit with Bridgestone's market strategy—the testimony shows that B&S was not the only dealership terminated for market strategy reasons. Unrebutted deposition testimony reveals that Bridgestone had terminated relationships with other dealers because they no longer fit with Bridgestone's market strategy. John Boynton, president of Bridgestone's commercial truck division, recalled at least four such terminations since 2010. Kurt Danielson recalled several more, throughout the 2000s. Moreover, the testimony establishes that B&S was the only dealership incapable of meeting even the most minimal requirements for a service dealer. According to Gaines, "[e]very dealer except for B&S can [fix a tire covered by a warranty]. When someone comes in, that's the minimum we expect . . . . That's our business." That B&S was the only dealership terminated for the precise reason that its unique tire broker business model did not fit with Bridgestone's service-oriented

market strategy does not, therefore, reasonably permit the inference that Bridgestone's stated reason was pretextual.[3]

B&S has not met its burden of demonstrating that Bridgestone's legitimate, non-discriminatory reason for terminating the dealership agreement was a mere pretext for race discrimination.[4] Accordingly, its claim under § 1981 fails.

* * *

We AFFIRM the district court's judgment in favor of Bridgestone.

---

[3] B&S also suggests that Bridgestone did not want B&S to become a service dealer, pointing to an affidavit in which a Bridgestone employee said that, if B&S had become a full-service dealer, B&S's business model would have given it an unfair advantage over other full-service dealers in the region. When belatedly presented with this argument in B&S's motion for reconsideration, the district court declined to consider it, noting that B&S had not raised it in its summary judgment briefing. On appeal, B&S does not attempt to show why this ruling was in error; we likewise decline to consider B&S's inadequately presented argument. *See Bank One, N.A. v. Echo Acceptance Corp.*, 380 F. App'x 513, 524 n.8 (6th Cir. 2010) (finding that arguments not properly raised in the trial court were forfeited).

[4] Like the district court, then, we need not address Bridgestone's additional stated reason for terminating the relationship with B&S—the difficult working relationship between the two companies. *See* Appellants Br. at 26 (stating that we need only consider the alternative reason "in the event this Court finds error in the District Court's prior decision").