**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HABEAS CORPUS RESOURCE CENTER; OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF ARIZONA,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH, Attorney General,<br><br>*Defendants-Appellants*. | No. 14-16928<br><br>D.C. No. 4:13-cv-04517-CW<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, Senior District Judge, Presiding

Argued and Submitted
December 10, 2015—San Francisco, California

Filed March 23, 2016

Before: Diarmuid F. O'Scannlain, Barry G. Silverman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Standing/Ripeness

The panel vacated the district court's decision on summary judgment and remanded with instructions to dismiss an action raising challenges to the Attorney General's 2013 regulations implementing a procedure for certifying a state's capital-counsel mechanisms for the fast-tracking of capital prisoners' federal habeas cases.

The panel held that the plaintiffs, the Habeas Corpus Resource Center and the Office of the Federal Public Defender for the District of Arizona, two governmental organizations that provide legal representation to capital defendants and prisoners, did not have standing to bring this action based on their theory of direct injury. Because the plaintiffs have not suffered a legally cognizable injury as a result of the promulgations of the final regulations, the panel did not need to address further their contentions that they had standing to challenge procedural errors in the notice-and-comment-rulemaking process and third-party standing on behalf of their clients.

The panel declined the plaintiffs' request for a limited remand to allow their clients an opportunity to intervene. The panel wrote that the Attorney General has not yet made any certification decisions, and, thus, challenges to the procedures and criteria set forth in the regulations are not ripe for review.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Samantha Lee Chaifetz (argued), Melissa N. Patterson, and Michael Raab, United States Department of Justice, Civil Division, Washington, D.C., for Defendants-Appellants.

Marc Shapiro (argued), Orrick, Herrington & Sutcliffe LLP, New York, New York; George E. Greer, Orrick, Herrington & Sutcliffe LLP, Seattle, Washington; Shannon Christine Leong, Catherine Y. Lui, and Darren S. Teshima, Orrick, Herrington & Sutcliffe LLP, San Francisco, California, for Plaintiffs-Appellees.

Kent S. Scheidegger, Criminal Legal Foundation, Sacramento, California, for Amici Curiae Marc Klaas and Edward G. Hardesty.

## OPINION

BEA, Circuit Judge:

Title 28, chapter 154 of the United States Code ("Chapter 154") permits the "fast-tracking" of federal habeas cases for capital prisoners from states that offer competent counsel to indigent capital prisoners during state postconviction proceedings. *See* 28 U.S.C. §§ 2261–2266. "Fast-tracking" principally affects habeas corpus petitioners because it contracts from one year to six months the period in which petitioners may file a timely federal habeas petition. *See id.* § 2263(a). Before a state can avail itself of Chapter 154's "fast-tracking" provisions, it must request and receive

certification from the Attorney General[1] that it "has established a mechanism for providing counsel in postconviction proceedings" to indigent capital prisoners. *Id.* §§ 2261(b)(1), 2265(a)(1)(A). In 2013, the Attorney General finalized regulations to implement a certification procedure, pursuant to 28 U.S.C. § 2265(b), and the plaintiffs then brought this action, which raises numerous challenges to the regulations, which challenges are based upon the Administrative Procedure Act ("APA"). On summary judgment, the district court sustained most of the plaintiffs' challenges, found the regulations arbitrary or capricious in several respects, and enjoined the regulations from going into effect. We vacate the district court's decision and remand with instructions to dismiss this case because the plaintiffs, two governmental organizations that provide legal representation to capital defendants and prisoners, did not have standing to bring this action. Furthermore, we decline the plaintiffs' request for a limited remand to allow their clients an opportunity to intervene; the Attorney General has not yet made any certification decisions, and, thus, challenges to the procedures and criteria set forth in the regulations are not yet ripe for review.

---

[1] The United States Department of Justice and the Attorney General are named as defendants in this case. Because the Attorney General is vested with the authority to promulgate the regulations at issue here, *see* 28 U.S.C. § 2265(b), we refer to the Attorney General when discussing the defendants. Loretta E. Lynch was substituted for Eric H. Holder Jr. as Attorney General on April 27, 2015.

# I

## A. Background on Chapter 154 and the Final Regulations

Although the federal Constitution requires that counsel be appointed for indigent criminal defendants when a conviction results in imprisonment, *see Alabama v. Shelton*, 535 U.S. 654, 661–62 (2002), this requirement does not extend, as a federal constitutional matter, to postconviction collateral attacks on a conviction or sentence in state or federal court, *see Pennsylvania v. Finley*, 481 U.S. 551, 555–59 (1987). Chapter 154, which was added by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides procedural benefits to states that voluntarily appoint counsel to represent indigent capital prisoners during state postconviction proceedings. *See* 28 U.S.C. §§ 2261–2266.**[2]**

For a state to "opt in" to Chapter 154, it must request and receive certification from the Attorney General that it "has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death." *Id.* § 2265(a)(1)(A); *see id.* § 2261(b)(1). For the state to invoke Chapter 154 in a particular capital prisoner's federal habeas case, it must have appointed counsel to represent the prisoner during state postconviction proceedings pursuant to its capital-counsel mechanism, unless the prisoner validly

---

**[2]** Federal law provides for the appointment of counsel to indigent capital prisoners during federal habeas proceedings. *See* 18 U.S.C. § 3599(a)(2).

waived counsel, retained his own counsel, or was found not indigent. *Id.* § 2261(b)(2).**³**

If Chapter 154 applies to a federal habeas case, then, among other things, (1) the capital prisoner can secure an automatic stay from execution while his state postconviction and federal habeas proceedings are ongoing, *see id.* § 2262; (2) the statute of limitations for filing a federal habeas petition is shortened from one year to six months from the date of final judgment of the state courts on direct appeal, *compare id.* § 2244(d) (general rule), *with id.* § 2263(a) (Chapter 154 rule); and (3) the federal courts must give priority status to the habeas case and resolve it within the time periods specified by Chapter 154, *see id.* § 2266.

Chapter 154 requires the Attorney General to certify state capital-counsel mechanisms that comply with the requirements of Chapter 154, and such certification decisions are subject to de novo review in the U.S. Court of Appeals for the D.C. Circuit. *Id.* § 2265(a), (c). The Attorney General must also promulgate regulations to implement such certification procedure. *Id.* § 2265(b). After engaging in

---

**³** Federal courts entertaining habeas corpus petitions were previously required to determine whether a state's capital-counsel mechanism qualified the state to receive Chapter 154's benefits. *See* 28 U.S.C. § 2261(b) (Supp. III 1997); *Spears v. Stewart*, 283 F.3d 992, 1008–09 (9th Cir. 2002) (amended opinion). In 2006, Congress amended Chapter 154 to shift responsibility for determining the adequacy of state capital-counsel mechanisms from the federal courts to the Attorney General. *See* USA PATRIOT Improvement & Reauthorization Act of 2005, Pub. L. No. 109-177, § 507, 120 Stat. 192, 250–51 (2006). Under all versions of the statute, such federal habeas courts must still determine whether the state did appoint counsel to represent the capital prisoner during state postconviction proceedings, pursuant to the state's capital-counsel mechanism.

notice-and-comment rulemaking, the Attorney General finalized such regulations in September 2013 ("Final Regulations"). *See* 78 Fed. Reg. 58,160 (Sept. 23, 2013).[4]

The Final Regulations establish a procedure for certifying whether a state's mechanism is adequate for the appointment of professionally competent counsel to represent indigent capital prisoners during state postconviction proceedings. The Final Regulations require a state to request certification; the Attorney General must post the state's request on the Internet, solicit public comments, and review such comments during the certification process. *See* 28 C.F.R. § 26.23. If the Attorney General certifies that a state's capital-counsel mechanism conforms to the requirements of Chapter 154 and the Final Regulations, she also must determine the date on which the state established its mechanism. *See* 28 C.F.R. § 26.23(c)–(d); *see also* 28 U.S.C. § 2265(a)(1)(B). The certification is effective as of the date the Attorney General finds the state established its adequate mechanism; as this date can be in the past, a certification decision may apply retroactively. 28 U.S.C. § 2265(a)(2); 28 C.F.R. § 26.23(c).

The Final Regulations also set forth substantive criteria that a state's capital-counsel mechanism must meet to be certified. Consistent with 28 U.S.C. § 2261(c)–(d), a state's mechanism must require a court of record to appoint counsel

---

[4] The Attorney General first issued final regulations under Chapter 154 in 2008. *See* 73 Fed. Reg. 75,327 (Dec. 11, 2008). The district court preliminarily enjoined the Attorney General from putting those regulations into effect, concluding that notice of certain aspects of the final regulations had been inadequate. *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, No. C 08-2649 CW, 2009 WL 185423, at *7–*8, *10 (N.D. Cal. Jan. 20, 2009). The Attorney General subsequently withdrew those regulations. *See* 75 Fed. Reg. 71,353 (Nov. 23, 2010).

to represent an indigent capital prisoner in state postconviction proceedings unless the capital prisoner competently rejected the offer of counsel or was not indeed indigent. 28 C.F.R. § 26.22(a). If the court appoints counsel, the attorney must not have represented the prisoner at trial, unless the attorney and prisoner expressly agree otherwise. *See id.* Under the Final Regulations, a state's capital-counsel mechanism must include competency and compensation standards for counsel appointed pursuant to the mechanism. The Final Regulations provide two competency benchmarks, as well as a catchall provision for mechanisms that "otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases." *Id.* § 26.22(b)(2). Similarly, the Final Regulations provide four compensation benchmarks, as well as a catchall provision for mechanisms that are "otherwise reasonably designed to ensure the availability for appointment of counsel" satisfying the competency standards. *Id.* § 26.22(c)(2). A state's mechanism must also authorize payment of "the reasonable litigation expenses of appointed counsel." *Id.* § 26.22(d); *accord* 28 U.S.C. § 2265(a)(1)(A).

## B.  Procedural History

After the Attorney General issued the Final Regulations in 2013, the Habeas Corpus Resource Center ("HCRC") and the Office of the Federal Public Defender for the District of Arizona ("Arizona FPD") (collectively, "Defender Organizations"), commenced this action, in which they sought to block the Final Regulations from taking effect. Their complaint alleged four causes of action under the APA: (1) the Attorney General had failed to give adequate notice regarding certain aspects of the Final Regulations; (2) the Attorney General had failed to respond to significant public

comments made about the Final Regulations during notice-and-comment rulemaking; (3) the certification process prescribed by the Final Regulations is arbitrary or capricious because it is exempt from the APA's notice-and-comment-rulemaking requirements and does not allow for meaningful public participation; and (4) the substantive criteria set forth in the Final Regulations are arbitrary or capricious because they do not provide sufficient competency standards and fail to establish the factual bases on which the Attorney General will make certification decisions.[5]

The Defender Organizations are governmental organizations that counsel capital defendants and prisoners and represent capital prisoners in federal habeas proceedings.[6] According to declarations submitted by the Defender Organizations to the district court, vagueness in the Final Regulations prevents the Defender Organizations from making reasonable predictions as to whether and how the Attorney General will certify state capital-counsel mechanisms and, thus, whether Chapter 154 may apply to their clients' federal habeas cases. The Defender Organizations declared that, as a result, they must make

---

[5] The Defender Organizations voluntarily withdrew a fifth cause of action, which alleged that the Attorney General's "involvement in the rulemaking and certification process violates the Due Process Clause of the United States Constitution."

[6] The HCRC is an office within the judicial branch of the State of California that represents indigent capital prisoners in state postconviction, federal habeas, and executive clemency proceedings. Similarly, the Arizona FPD is a federal defender organization that represents capital prisoners in federal habeas proceedings, provides legal assistance to capital defendants and prisoners and their counsel, and trains attorneys who represent capital prisoners in federal habeas proceedings.

immediate strategic and resourcing decisions, such as "whether to commit limited attorney time and financial resources," whether to "curtail the development of claims to include in a federal [habeas] petition," and how to advise appellate and postconviction counsel to preserve capital defendants' and prisoners' rights for their eventual federal habeas cases.

The district court agreed that "confusion" caused by the Final Regulations required the Defender Organizations to "make urgent decisions regarding their litigation, resources, and strategy." The district court held that this "confusion" was a legally cognizable injury sufficient to give the Defender Organizations standing to challenge the Final Regulations; it also ruled that the Defender Organizations' challenges to the Final Regulations were ripe for review. The district court issued a temporary restraining order preventing the Attorney General from applying the Final Regulations. The Defender Organizations then filed a motion for a preliminary injunction, which the district court granted. The Attorney General appealed the district court's order granting a preliminary injunction; while the appeal was pending, the parties cross-moved for summary judgment. On summary judgment, the district court sustained most of the Defender Organizations' challenges to the Final Regulations and found the Final Regulations arbitrary or capricious in several respects. The district court thus ordered that the Attorney General refrain from putting the Final Regulations into effect and held that the Attorney General "must remedy the defects identified in this order in any future efforts to implement the

procedure prescribed by chapter 154." The Attorney General appeals this decision.[7]

# II

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-or-controversy requirement ensures that "[f]ederal courts [do] not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (third alteration in original) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). This case involves two components of the Article III case-or-controversy requirement: standing, which concerns *who* may bring suit, and ripeness, which concerns *when* a litigant may bring suit. As noted, the district court found that the Defender Organizations had standing to bring this suit and that their challenges to the Final Regulations were ripe for review. We review the district court's standing and ripeness determinations de novo. *See Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).[8]

---

[7] The district court's final judgment superseded the preliminary injunction. As a result, we previously granted the Attorney General's unopposed motion to dismiss the appeal of the district court's order granting the preliminary injunction as moot.

[8] We note that the Supreme Court previously rejected, on jurisdictional grounds, a challenge arising out of the prior version of Chapter 154. Before the statute was amended in 2006, federal habeas courts—not the Attorney General—determined whether a state's capital-counsel mechanism qualified the state to receive Chapter 154's benefits. *See supra* note 3. In *Calderon v. Ashmus*, 523 U.S. 740, 743 (1998), a class of

## A. Standing

At the core of the Article III case-or-controversy requirement is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "It requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction," so that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original) (internal quotation marks and citations omitted).

---

California capital prisoners brought suit under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), seeking "declaratory and injunctive relief to resolve uncertainty over whether Chapter 154 applied" to them. *Ashmus*, 523 U.S. at 743. The Supreme Court found that this was not a justiciable Article III case or controversy. *Id.* at 749. The Court noted that the suit would not finally determine class members' entitlement to habeas relief; the class sought to resolve only a subsidiary legal issue, to wit, whether Chapter 154 would apply when class members eventually filed federal habeas petitions. *Id.* at 746–48. "Any risk associated with resolving [that] question in habeas, rather than a pre-emptive suit, is no different from risks associated with choices commonly faced by litigants." *Id.* at 748. The Court found that there was no concrete Article III case or controversy even though class members allegedly were forced "to make an unacceptable choice: filing a *pro se* [habeas] petition within 180 days in order to ensure compliance with Chapter 154, which may fail to raise substantial claims, or waiting until counsel is appointed, which may miss the 180-day filing deadline if Chapter 154 applies." *Id.* at 744, 746–48 & n.3. We recognize that there are clear parallels between *Ashmus* and this case. However, the Court focused on whether *Ashmus* presented "a concrete controversy susceptible to conclusive judicial determination," which is a jurisdictional prerequisite for cases arising under the Declaratory Judgment Act; the Court did not discuss the standing and ripeness issues that are present in this case. *Id.* at 748–49. As a result, *Ashmus* does not control our analysis.

Case law has "established that the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Defenders of Wildlife*, 504 U.S. at 560–61 (alterations in original) (citations and footnote omitted). The Defender Organizations "bear[] the burden of establishing these elements." *Id.* at 561. Because this is an appeal from an order granting summary judgment, we accept as true the declarations submitted by the Defender Organizations to the district court. *See id.* We find, however, that these declarations do not demonstrate that the Defender Organizations have suffered a legally cognizable injury in fact. As a result, the Defender Organizations did not have standing to bring this suit.

### 1. Direct Injury

At the outset, we note that the Final Regulations prescribe procedures and criteria to guide the Attorney General's

certification of state capital-counsel mechanisms; the Final Regulations thus directly affect only the Attorney General and, to some degree, states seeking certification under Chapter 154. *See* 28 C.F.R. §§ 26.22–.23. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). The Defender Organizations "can demonstrate standing only if application of the regulations by the Government will affect *them* in the manner described above." *Summers*, 555 U.S. at 494 (emphasis in original).

In their brief, the Defender Organizations set forth a connection between themselves and the Final Regulations which, they argue, establishes that they have suffered a legally cognizable injury due to the issuance of the Final Regulations. We do not disagree with the Defender Organizations on several points. To start, we do not dispute that, if Chapter 154 applies to a capital prisoner's federal habeas case, the prisoner may be adversely affected, particularly because Chapter 154 shortens the statute of limitations for filing a federal habeas petition from one year to six months.[9] *See* 28 U.S.C. § 2263(a). We also do not doubt that Chapter 154's shorter statute of limitations may alter the Defender Organizations' "strategic considerations in the development and presentation of appellate and post-conviction claims, the calculation of legal and financial resources available to competently prepare and litigate cases,

---

[9] We do not decide here whether this effect alone constitutes a legally cognizable injury sufficient to confer standing on capital prisoners to challenge the Final Regulations directly.

and the advice to counsel and clients who are subject [to] its provisions." (Alteration in original.) And we recognize that the Final Regulations influence whether Chapter 154 will apply to a capital prisoner's federal habeas case, as they guide the Attorney General's certification process under Chapter 154. Further, a state must request and receive certification from the Attorney General before it may seek to invoke Chapter 154 in a capital prisoner's federal habeas case. *See id.* §§ 2261(a)(1)(A), 2265(b)(1).

The Defender Organizations base their claim of injury on the role the Final Regulations play in the certification process. According to the Defender Organizations, the Final Regulations create "'significant confusion' insofar as [they] provide[] (1) no basis for understanding what evidence or measure of sufficiency the Attorney General will rely upon in making . . . certification decisions, (2) no procedural safeguards to those directly affected by certification or an opportunity to meaningfully contribute to the certification decision, and (3) no indication whether a certification decision will be guided by the body of law interpreting Chapter 154 prior to its amendment." In light of this "confusion," the Defender Organizations assert that they and their death-sentenced clients "are faced with two untenable choices: either proceed as if Chapter 154 does not apply, and thereby risk the forfeiture of potentially meritorious claims against their convictions and death sentences if the time limitations of Chapter 154 are later found to be applicable; or attempt to comply with those stringent limitations, and thereby forego full investigation and adequate factual and

legal development of their constitutional claims."**10** The Defender Organizations assert that the Final Regulations have injured them because they must "assume the worst and 'immediately make litigation, resource, and advisory decisions' in the dark," such as "whether to commit limited attorney time and financial resources, and, in some instances, curtail the development of claims to include in a federal petition, in order to comply with a six month, rather than one year, statute of limitations."

This is a long-winded explanation of what we think is a relatively simple notion: The Defender Organizations contend that they had standing to challenge the Final Regulations because the Final Regulations are vague, and the Defender Organizations must advise and assist their death-sentenced clients without knowing, in advance, whether the Attorney General will certify state capital-counsel mechanisms and whether Chapter 154 may therefore apply to their clients' federal habeas cases. However, we fail to see how the Defender Organizations have suffered a concrete, particularized**11** injury sufficient to give them standing to challenge the Final Regulations. The Defender Organizations' bare uncertainty regarding the validity of the Final Regulations and the applicability of Chapter 154 to their clients' federal habeas cases, absent "any concrete application that threatens imminent harm to [their] interests," cannot

---

**10** This is very similar to the risk that the Supreme Court in *Ashmus* found was insufficient to give rise to a concrete case or controversy under the Declaratory Judgment Act. *See supra* note 8.

**11** "Particularized" in this context "mean[s] that the injury must affect the plaintiff in a personal and individual way." *Defenders of Wildlife*, 504 U.S. at 560 n.1.

support standing. *Summers*, 555 U.S. at 494; *see Lewis*, 494 U.S. at 477–79; *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 951–55 (9th Cir. 2006).

Nor is it enough that vagueness in the Final Regulations may cause the Defender Organizations to "assume the worst" and change their litigation strategy to file their clients' federal habeas petitions within the six-month statute-of-limitations period prescribed by Chapter 154 instead of the general one-year statute-of-limitations period. *Cf. Calderon v. Ashmus*, 523 U.S. 740, 748 (1998) ("Any risk associated with resolving the question [whether Chapter 154 applies] in habeas, rather than a pre-emptive suit, is no different from risks associated with choices commonly faced by litigants."). Assisting and counseling clients in the face of legal uncertainty is the *role* of lawyers,[12] and, notably, the Defender Organizations have not cited any authority suggesting that lawyers suffer a legally cognizable injury in fact when they take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty.[13] Taken

---

[12] We recognize that the Defender Organizations are in a different position from typical attorneys: They are governmental organizations that have a mandate to represent indigent clients; they cannot recoup the cost of their representation and must make independent resourcing decisions in light of legal uncertainty created by the Final Regulations. However, we think that distinction is unimportant, and the Defender Organizations have cited no authority that would support standing in light of that distinction.

[13] The Defender Organizations emphasize that the district court ruled that they had standing to challenge the Attorney General's Chapter 154 regulations on three separate occasions: twice in this case and once in a prior, related case. *See also supra* note 4. However, the decision we here review provides little authoritative support for the rulings in that very decision. Further, we cannot affirm the district court's decision because it made the same analytical mistake three times instead of just once. The

to its logical conclusion, this theory of injury would permit attorneys to challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected. We think the Defender Organizations would be hard-pressed to find authority supporting such an expansion of standing. *Cf. Summers*, 555 U.S. at 494 (opining that allowing the plaintiff to challenge a "regulation in the abstract . . . would fly in the face of Article III's injury-in-fact requirement").

Indeed, a recent Supreme Court case undercuts the Defender Organizations' claim of direct injury. In *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1142 (2013), lawyers, journalists, and others sought to enjoin the enforcement of 50 U.S.C. § 1881a, a statute authorizing governmental surveillance of communications with foreign persons. The plaintiffs claimed that they had standing because, among other reasons, they were injured by the need to take measures to avoid surveillance when communicating with their foreign contacts. *Id.* at 1150–51. The Supreme Court rejected that argument, holding that the harm the

---

closest *relevant* cases the Defender Organizations cite are *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005), and *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 445–47 (9th Cir. 1994). But in those cases, the plaintiffs challenged regulations that directly affected their rights, not the rights of any client of theirs. *See Paulsen*, 413 F.3d at 1005 ("The effect of the regulation was to deny [the petitioners] sentence reduction."); *Yesler Terrace*, 37 F.3d at 445–47 ("As a consequence of HUD's decision, [the plaintiffs], personally, now are subject to the threat of eviction for alleged criminal activity without recourse to an informal grievance hearing."). These cases may support the standing of capital prisoners—the Defender Organizations' *clients*—to challenge the Final Regulations, but they do not support the standing of the Defender Organizations themselves.

plaintiffs sought to avoid was not "certainly impending," as the plaintiffs could only "speculate and make assumptions about whether their communications with their foreign contacts [would] be acquired under § 1881a." *Id.* at 1148. The plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," even though the measures they took were "a reasonable reaction to a risk of harm." *Id.* at 1151.

So too here, it may be eminently reasonable for the Defender Organizations to take measures to prevent or mitigate the harm their clients may face due to the possible future application of Chapter 154 to their federal habeas cases. But, the Defender Organizations face no "certainly impending" harm resulting from the issuance and application of the Final Regulations; even if their clients face a "certainly impending" harm from "confusion" caused by the Final Regulations, the Defender Organizations have given us no reason to believe that they can parlay such harm into an injury of their own. We therefore hold that the Defender Organizations did not have standing to bring this suit based on their theory of direct injury, as propounded in their declarations and accepted by the district court.[14]

---

[14] We also question whether the Defender Organizations' claimed injury is fairly traceable to the Final Regulations or redressable by setting aside the Final Regulations. However, because we find that the Defender Organizations have not suffered a legally cognizable injury in fact, we need not, and do not, analyze the remaining prongs of the standing inquiry.

### 2.  *Third-Party Standing and Procedural Standing*

In their brief, the Defender Organizations advance, for the first time, two additional theories of standing. First, they claim that, at a minimum, they had standing to challenge procedural errors in the notice-and-comment-rulemaking process that culminated in the issuance of the Final Regulations, because they participated in that process. Second, the Defender Organizations argue that they had third-party standing to challenge the Final Regulations on behalf of their death-sentenced clients. However, even under these theories, the Defender Organizations must identify a concrete interest of their own that is harmed by the Final Regulations; they cannot circumvent the injury-in-fact requirement of standing. *See, e.g.*, *Summers*, 555 U.S. at 496 (procedural standing); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (third-party standing). Because we find that the Defender Organizations have not suffered a legally cognizable injury as a result of the promulgation of the Final Regulations, we need not address these theories further.

## B.  Ripeness

Because we find that the Defender Organizations lacked standing to challenge the substance of the Final Regulations, we decide next whether to grant the Defender Organizations' request for a limited remand to afford their death-sentenced clients an opportunity to intervene. We decline to follow this course of action, because the challenges to the substance of the Final Regulations that the Defender Organizations raise—

and, by extension, those that their clients would raise if they intervened in this case—are not yet ripe for review.[15]

Ripeness doctrine seeks "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). In resolving ripeness questions, courts examine the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.* at 149.

Ripeness issues arise often when a litigant seeks "pre-enforcement review" of an agency's regulations—that is, the litigant challenges regulations anticipating that an administrative agency will, in the near future, apply those regulations in a manner that will harm the litigant's interests. *See, e.g.*, *id.* Courts permit pre-enforcement review of regulations understanding that regulations can immediately affect "primary conduct": Regulated parties may have to choose between complying with the regulations immediately or facing penalties. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*,

---

[15] We could also conceivably scrutinize the ability of capital prisoners to challenge the Final Regulations in terms of standing, because, "[w]hen addressing the sufficiency of a showing of injury-in-fact grounded in potential future harms, Article III standing and ripeness issues often 'boil down to the same question.'" *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014) (amended opinion) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 n.5 (2014)); *see also Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975). We think ripeness cases better describe the jurisdictional constraints on capital prisoners who might seek preemptively to challenge the Final Regulations.

497 U.S. 871, 891–92 (1990). The Final Regulations are of a different sort, because they do not act upon capital prisoners but guide the Attorney General's certification of state capital-counsel mechanisms. *See* 28 C.F.R. §§ 26.22–.23. A capital prisoner's federal habeas rights may be affected indirectly, *if* the sentencing state requests certification and *if* the Attorney General finds that the state's capital-counsel mechanism comports with Chapter 154 and the Final Regulations. *See* 28 U.S.C. §§ 2261(a), 2265(a)–(b); 28 C.F.R. §§ 26.22–.23.

To determine whether the challenges to the substance of the Final Regulations are ripe, we must consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). We think this case is analogous to *Ohio Forestry* and, as in that case, consideration of these factors forecloses review here.

In *Ohio Forestry*, the Forest Service developed a plan, mandated by statute, for managing the natural resources of the Wayne National Forest. *Id.* at 728–29. The plan set logging goals, selected areas of the forest suitable for logging, and determined appropriate methods for timber harvesting. *Id.* at 730. Promulgation of the plan made logging more likely because a plan is a "logging precondition"—"in its absence logging could not take place"—but the plan did not itself authorize the cutting of any trees. *Id.* The Forest Service had to take additional steps to permit logging, and its decisions were subject to an administrative-appeals process and judicial review. *Id.* The Sierra Club challenged the plan as wrongly

favoring logging; the Supreme Court ruled that the challenge was not ripe for review. *Id.* at 732–37.

The Court noted first that the Forest Service's plan did not "command anyone to do anything or to refrain from doing anything"; before the Forest Service could permit logging, it had to "focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court." *Id.* at 733–34. This gave the Sierra Club "ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain, [which] challenge might also include a challenge to the lawfulness of the present Plan." *Id.* at 734. The same is true here: The Final Regulations do not require anything of capital prisoners—or indeed of their lawyers—and do not immediately alter their federal habeas rights or procedures. *See* 28 C.F.R. §§ 26.22–.23. Before a capital prisoner's rights may be affected, the sentencing state must request certification by the Attorney General, the Attorney General must (under the Final Regulations) allow for public comment on the request, and the Attorney General must then certify that the state's capital-counsel mechanism is compliant with Chapter 154. *See* 28 U.S.C. § 2265; 28 C.F.R. § 26.23. That decision is (under Chapter 154) subject to de novo review in the D.C. Circuit.[16] 28 U.S.C. § 2265(c). Delayed judicial review of the Final Regulations is unlikely to cause hardship to capital prisoners, even if they might change their strategy

---

[16] The D.C. Circuit's de novo review of certification decisions is different from—and less deferential than—typical judicial review of agency action, which is governed by the arbitrary-or-capricious standard. *Compare* 28 U.S.C. § 2265(c)(3) (Chapter 154), *with* 5 U.S.C. § 706(2)(A) (APA).

for pursuing postconviction relief in light of the promulgation of the Final Regulations. *Cf. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–12 (2003) (finding unripe a challenge to regulations exempting concession contracts from the provisions of the Contract Disputes Act of 1978 ("CDA") even though "applicability *vel non* of the CDA is one of the factors a concessioner takes into account when preparing its bid for . . . concession contracts" and rejecting the argument that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis").

As to the second *Ohio Forestry* factor, the Supreme Court noted that judicial interference "could hinder agency efforts to refine its policies . . . through application of the Plan in practice." 523 U.S. at 735–36. Similarly here, the Attorney General must interpret and apply the Final Regulations when evaluating specific state capital-counsel mechanisms, and judicial review of the Final Regulations has prevented the Attorney General from doing so. The Defender Organizations (and, hence, their clients) essentially complain that the Final Regulations do not make clear precisely how the Attorney General will conduct the certification process, how the Attorney General will make certification decisions, and how the Attorney General will apply the catchall provision for competency of counsel. These issues will sort themselves out as the Attorney General applies the Final Regulations, makes certification decisions, and justifies those decisions in the D.C. Circuit, if indeed challenged. *Cf. Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164–65 (1967).

Considering the third *Ohio Forestry* factor, we think that, in the absence of a concrete application of the Final Regulations, the challenges to the substance of the Final Regulations represent "'abstract disagreements over

administrative policies,' that the ripeness doctrine seeks to avoid." 523 U.S. at 736 (quoting *Abbott Labs.*, 387 U.S. at 148). Any deficiencies in the certification process and the criteria prescribed by the Final Regulations will become clearer as the Attorney General makes certification decisions and as those decisions undergo de novo review in the D.C. Circuit. *See id.* at 737 ("All this is to say that further factual development would 'significantly advance our ability to deal with the legal issues presented' and would 'aid us in their resolution.'" (quoting *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 82 (1978)); *cf. Pearson v. Shalala*, 164 F.3d 650, 661 (D.C. Cir. 1999) ("That is not to say that the agency was necessarily required to define the term in its initial general regulation—or indeed that it is obliged to issue a comprehensive definition all at once. The agency is entitled to proceed case by case . . . ."). We find the challenges to the substance of the Final Regulations not ripe for review at this time. We therefore decline to remand this case to the district court to allow capital prisoners an opportunity to intervene and interpose these challenges.[17]

---

[17] The Defender Organizations renew their argument that the Attorney General failed to give adequate notice that certification decisions will be treated as orders, not rules, and will not be subject to the dictates of notice-and-comment rulemaking under the APA. Ordinarily, we would agree that such a procedural claim is ripe for review. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976–78 (9th Cir. 2003); *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 216 (D.C. Cir. 2007). We question whether the same ripeness conclusion holds here: The Defender Organizations essentially complain that they did not receive notice that the certification process prescribed by the Final Regulations will not meet certain procedural requirements, but the Attorney General has not yet endeavored to begin the certification process. The Attorney General may very well afford the Defender Organizations all the procedural protections they seek. *Cf. Colwell*, 558 F.3d at 1124–28. In any event, we need not decide this issue, because the Defender Organizations

## III

For these reasons, we vacate the decision of the district court and remand with instructions to dismiss this case for lack of jurisdiction. Each party will bear its own costs on appeal.

**VACATED and REMANDED with instructions.**

---

did not have standing to bring that claim. *See supra*. The Defender Organizations do not appear to request that we remand this case to the district court to allow capital prisoners to intervene regarding the inadequate-notice claim—perhaps because the district court found in favor of the Attorney General on that claim—and we decline to do so.