**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF MISSOURI EX REL. CHRIS KOSTER, Attorney General; STATE OF NEBRASKA EX REL. JON BRUNING, Attorney General; STATE OF OKLAHOMA EX REL. E. SCOTT PRUITT, Attorney General; STATE OF ALABAMA EX REL. LUTHER STRANGE, Attorney General; COMMONWEALTH OF KENTUCKY EX REL. JACK CONWAY, Attorney General; TERRY E. BRANSTAD, Governor of State of Iowa, *Plaintiffs-Appellants*, | No. 14-17111 <br><br> D.C. No. 2:14-cv-00341-KJM-KJN <br><br><br> OPINION |

v.

KAMALA D. HARRIS, in her official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture,
             *Defendants-Appellees*,

and

HUMANE SOCIETY OF THE UNITED STATES; ASSOCIATION OF CALIFORNIA EGG FARMERS,
   *Intervenor-Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted October 19, 2016
San Francisco, California

Filed November 17, 2016

Before:  Susan P. Graber and Mary H. Murguia, Circuit
Judges, and Raner C. Collins,* Chief District Judge.

Opinion by Judge Graber

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's dismissal of an
action for lack of *parens patriae* standing but remanded with
instructions to dismiss without prejudice.

Plaintiffs are six states seeking to block enforcement of
California laws and regulations prescribing standards for the
conditions under which chickens must be kept in order for
their eggs to be sold in the state.  Plaintiffs sought to block
the laws before they took effect. The panel held that the

---

* The Honorable Raner C. Collins, Chief United States District Judge
for the District of Arizona, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

plaintiffs failed to establish *parens patriae* standing because: (1) they failed to articulate an interest apart from the interests of private egg producers, who could have filed an action on their own behalf; (2) the allegations about potential economic effects of the challenged laws, after implementation, were necessarily speculative; and (3) the allegations of discrimination were misplaced because the laws do not distinguish among eggs based on their state of origin. The panel further held that the district court did not err by denying leave to amend because plaintiffs would be unable to assert *parens patriae* standing in an amended complaint.

The panel held that because in theory, plaintiffs could allege post-effective-date facts that might support standing, the complaint should have been dismissed without prejudice.

**COUNSEL**

J. Andrew Hirth (argued), Deputy General Counsel, Office of the Missouri Attorney General, Jefferson City, Missouri, for Plaintiffs-Appellants.

Paul Stein (argued) and Stephanie F. Zook, Deputy Attorneys General; Constance L. LeLouis, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellees.

Bruce Wagman (argued), Schiff Hardin LLP, San Francisco, California; Rebecca Cary and Peter A. Brandt, Humane Society of the United States, Washington, D.C.; Jonathan Y. Ellis and J. Scott Ballenger, Latham & Watkins LLP,

Washington, D.C.; for Intervenor-Defendant-Appellee Humane Society of the United States.

Carl Nichols (argued), Thomas G. Sprankling, Adam I. Klein, and Francesco Valenti, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Randall R. Lee, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; for Intervenor-Defendant-Appellee Association of California Egg Farmers.

Sean D. Reyes, Utah Attorney General; Parker Douglas, Utah Federal Solicitor; Utah Attorney General's Office, Salt Lake City, Utah; for Amicus Curiae State of Utah.

Timothy S. Bishop, Michael B. Kimberly, and James F. Tierney, Mayer Brown LLP, Washington, D.C.; Ellen B. Steen and Danielle Hallcom Quist, America Farm Bureau Federation, Washington, D.C.; for Amicus Curiae American Farm Bureau Federation.

Diane L. McGimsey, Edward E. Johnson, Janet Y. Galeria, and Jonathon D. Townsend, Sullivan & Cromwell LLP, Los Angeles, California, for Amici Curiae Animal Legal Defense Fund; Compassion Over Killing, Inc.; and Farm Sanctuary, Inc.

**OPINION**

GRABER, Circuit Judge:

California enacted laws and regulations prescribing standards for the conditions under which chickens must be kept in order for their eggs to be sold in the state.  Plaintiffs are six states, which sued to block enforcement of those laws and regulations before they took effect.  We agree with the district court that  Plaintiffs lacked standing to bring this case as *parens patriae*.  We also hold that the district court did not err in denying Plaintiffs leave to amend their complaint.  But because the action should have been dismissed without prejudice, we affirm but remand with instructions to dismiss the action without prejudice.

In the 2008 general election, California voters adopted Proposition 2, which enacted new standards beginning on January 1, 2015, for housing farm animals within California including, as relevant here, egg-laying hens.  Cal. Health & Safety Code §§ 25990–94.  Under Proposition 2, hens may not be confined for the majority of any day "in a manner that prevents [them] from:  (a) Lying down, standing up, and fully extending [their] limbs; and (b) Turning around freely."  *Id.* § 25990.  A violation of these standards is punishable by a $1,000 fine or imprisonment of 180 days in county jail, or both.  *Id.* § 25993.

In 2010, California's legislature adopted Assembly Bill 1437 ("AB1437"), which mandated, also beginning on January 1, 2015, that "a shelled egg shall not be sold or contracted for sale for human consumption in California if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in

[Proposition 2]." Cal. Health & Safety Code § 25996. Therefore, all eggs sold in California must comply with Proposition 2. In 2013, the California Department of Food and Agriculture promulgated egg-related regulations, including salmonella prevention measures and minimum cage sizes for egg-laying hens, all of which also carried an effective date of January 1, 2015. Cal. Code Regs. tit. 3, § 1350(d)(1).

On February 3, 2014, the State of Missouri filed a complaint in the Eastern District of California, asking the court to declare AB1437 and California Code § 1350(d)(1) (collectively the "Shell Egg Laws") invalid, as violating the Commerce Clause or as preempted by federal statute, and to enjoin California from enforcing the laws. Plaintiffs then filed their First Amended Complaint (the "complaint"), joining the States of Nebraska, Oklahoma, Alabama, and Kentucky and the Governor of Iowa as additional plaintiffs. The Humane Society of the United States and the Association of California Egg Farmers ("Intervenors") moved to intervene as defendants, which the court allowed. Defendants filed a motion to dismiss for lack of subject matter jurisdiction; Intervenors filed their own, similar motions. The district court granted the motions to dismiss, with prejudice. The court concluded that Plaintiffs lacked standing as *parens patriae*, held that their claim was not justiciable, and denied leave to amend as futile. Plaintiffs timely appeal.

A. *Parens Patriae Standing*

States asserting *parens patriae* standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine. *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001). "To establish Article III standing, an injury must be

concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted). In a *parens patriae* case, there are two additional requirements. First, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez ("Snapp")*, 458 U.S. 592, 607 (1982). Second, "[t]he State must express a quasi-sovereign interest." *Id.* On de novo review, *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241, 1247 (9th Cir. 2016), we conclude that Plaintiffs have not met the first requirement. We therefore need not, and do not, reach the second part of the test, nor do we reach the issue of ripeness.

There are no "definitive limits on the proportion of the population of the State that must be adversely affected." *Snapp*, 458 U.S. at 607. But "more must be alleged than injury to an identifiable group of individual residents." *Id.* "[T]he indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.*[1]

---

[1] It is unclear whether "substantial segment of the population" and "interest apart from the interest of particular private parties" are separate elements of standing. *See, e.g.*, *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (describing these as separate requirements). *Snapp* itself suggests that "substantial segment" may be merely an additional explanation of the need for the State to be "more than a nominal party." 458 U.S. at 607. The district court likewise combined these concepts into one element. Given the close similarity of the parties' arguments under these headings, we discuss the two formulations as a single element, but we would reach the same conclusion even if we treated them separately.

Concerning the parties, the complaint alleges: "Missouri farmers produced nearly two billion eggs in 2012 and generated approximately $171 million in revenue for the state"; "Nebraska is one of the top ten largest egg producers in the United States"; "Alabama is one of the top fifteen largest egg producers in the United States"; "Kentucky farmers produced approximately 1.037 billion eggs in 2012 and generated approximately $116 million in revenue for the state"; "Oklahoma farmers produced more than 700 million eggs in 2012 and generated approximately $90 million in revenue for the state"; and "Iowa is the number one state in egg production[,] Iowa farmers produce over 14.4 billion eggs per year," and "[t]he cost to Iowa farmers to retrofit existing housing or build new housing that complies with AB1437 would be substantial."

The laws "forc[e] Plaintiffs' farmers either to forgo California's markets altogether or accept significantly increased production costs just to comply." That is, "Plaintiffs' egg farmers must choose either to bring their entire operations into compliance . . . or else simply leave the California marketplace." "[T]he necessary capital improvements [would] cost Plaintiffs' farmers hundreds of millions of dollars," and, without access to the California market, "supply would outpace demand by half a billion eggs, causing the price of eggs—as well as egg farmers' margins—to fall throughout the Midwest and potentially forc[e] some Missouri producers out of business. The same goes for egg producers in Nebraska, Alabama, Oklahoma, Kentucky, and Iowa."

In short, the complaint alleges the importance of the California market *to egg farmers* in the Plaintiff States and the difficult choice that *egg farmers* face in deciding whether to comply with the Shell Egg Laws. The complaint contains

no specific allegations about the statewide magnitude of these difficulties[2] or the extent to which they affect more than just an "identifiable group of individual" egg farmers. *Snapp*, 458 U.S. at 607.

Plaintiffs advance several theories to demonstrate "an interest apart from the interests of particular private parties" and an effect on "a sufficiently substantial segment of [the] population." *Id.*  First, Plaintiffs allege harm to their egg farmers.  Second, Plaintiffs argue that the Shell Egg Laws will cause harmful fluctuations in the price of eggs.  Finally, Plaintiffs allege that they will suffer discrimination from the Shell Egg Laws.  For the reasons that follow, none of these theories establishes standing.

### 1. *Alleged Harm to Egg Farmers*

Alleging harm to the egg farmers in Plaintiffs' States is insufficient to satisfy the first prong of *parens patriae* standing.  Other courts have recognized that *parens patriae* standing is inappropriate where an aggrieved party could seek private relief.  The Second Circuit, for example, held that "*[p]arens patriae* standing . . . requires a finding that individuals could not obtain complete relief through a private suit." *N.Y. ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc); *see also Connecticut v. Physicians Health Servs. of Conn., Inc.*, 103 F. Supp. 2d 495,

---

[2] At a hearing, the district court asked Plaintiffs where in their complaint they alleged harm to more than just egg producers.  Plaintiffs' lawyer pointed to paragraphs 7 and 13.  Paragraph 7 describes harm to egg farmers.  Paragraph 13 includes no specific facts, stating only, in conclusory fashion, that "Missouri's economy and status within the federal system will be irreparably injured."

504 (D. Conn. 2000) (noting that "the Second Circuit has interpreted *Snapp* to require a finding that the State act on behalf of individuals who could not obtain complete relief through a private suit"). Here, complete relief would be available to the egg farmers themselves, were they to file a complaint on their own behalf.

Supreme Court cases in which private relief was held to be unlikely or unrealistic illustrate why *parens patriae* standing does not lie here. In *Missouri v. Illinois*, 180 U.S. 208 (1901), though never explicitly calling it a *parens patriae* case, the Supreme Court heard a sewage dispute between two states. The Court observed that "the nature of the injury complained of is such that an adequate remedy can only be found in this court at the suit of the state of Missouri." *Id.* at 241. The Court emphasized that the "health and comfort of the large communities inhabiting those parts of the state situated on the Mississippi River are not alone concerned, but contagious and typhoidal diseases introduced in the river communities may spread themselves throughout the territory of the state." *Id.*; *see also Snapp*, 458 U.S. at 603 (describing "a line of cases . . . in which States successfully sought to represent the interests of their citizens in enjoining public nuisances"). In other words, Missouri alleged that a public health hazard affected its entire population. By contrast, the Shell Egg Laws are not alleged to threaten the health of the entire population (or, indeed of anyone), and those directly affected—egg farmers—are capable of pursuing their own interests.

A rationale similar to that in *Missouri v. Illinois* supported *parens patriae* standing in *Maryland v. Louisiana*, 451 U.S. 725 (1981). There, Louisiana imposed a "First-Use Tax" on natural gas piped into the state from federal offshore drilling areas. A group of states, later joined by the federal

government and several pipeline companies, filed an original jurisdiction suit in the Supreme Court challenging the tax under, among other sources, the Commerce Clause. The Court found jurisdiction on several theories, including the States' interest as *parens patriae*. *Id.* at 737. The Court observed that

> the incidence of the Tax [does not] fall on a small group of citizens who are likely to challenge the Tax directly. Rather, a great many citizens in each of the plaintiff States are themselves consumers of natural gas and are faced with increased costs aggregating millions of dollars per year. As the Special Master observed, individual consumers cannot be expected to litigate the validity of the First-Use Tax given that the amounts paid by each consumer are likely to be relatively small.

*Id.* at 739. *Maryland v. Louisiana*'s logic counsels the opposite result here: Whereas millions of consumers probably cannot challenge another state's tax on their commodities, large egg producers certainly could file an action like this one on their own.

### 2. *Alleged Fluctuation in the Price of Eggs*

Plaintiffs argue that fluctuations in the price of eggs will harm consumers, thereby affecting a substantial segment of their populations and establishing *parens patriae* standing. Plaintiffs filed their complaint before the Shell Egg Laws took effect. As a result, their allegations about the potential economic effects of those laws, after implementation, were necessarily speculative. Indeed, Plaintiffs' allegations are inconsistent; the complaint alleges that prices will go either

up or down.  On the one hand, Plaintiffs allege that farmers must bring all egg facilities into compliance with the Shell Egg Laws, regardless of the proportion of their product actually bound for California, because the demand across markets fluctuates.  The cost of "compliant" eggs will thus increase across the board.  On the other hand, Plaintiffs allege that, if farmers decline to comply and they exit the California market, "the price of eggs . . . [would] fall throughout the Midwest."  Neither of these alleged results is sufficient to support *parens patriae* standing.

At the outset, the unavoidable uncertainty of the alleged future changes in price makes the alleged injury insufficient for Article III standing.  In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), the Supreme Court explained that it is "substantially more difficult" for a plaintiff to establish standing when the plaintiff "is not himself the object of the government action or inaction he challenges":

> [C]ausation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Id.* (citations and internal quotation marks omitted). Although *Lujan* describes facts that must be averred on summary judgment, the complaint here cannot allege, even under the more permissive standards at the pleading stage, that the choices leading to consumer price increases "have been or will be made." *Id.* Instead, the allegations in the complaint are "too speculative for Article III purposes," and Plaintiffs have failed to explain how the injury is "*certainly impending.*" *Id.* at 565 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also Clapper*, 133 S. Ct. at 1147 (rejecting the Second Circuit's "objectively reasonable likelihood" standard as "inconsistent with our requirement that threatened injury must be certainly impending to constitute injury in fact" (internal quotation marks omitted)); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 952 (9th Cir. 2013) (finding concrete, particularized injury when utility price increases will affect customer-plaintiffs indirectly due to "'pass-through' contracts" that "almost certainly" pass along increases). Unlike the First-Use Tax in *Maryland v. Louisiana* or the threatened withdrawal of West Virginia gas in *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923)—both of which presented state actions with nearly certain price effects for many or all of the plaintiffs' citizens—here, the alleged price effects for consumers are remote, speculative, and contingent upon the decisions of many independent actors in the causal chain in response to California laws that have no direct effect on either price or supply. The Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 133 S. Ct. at 1150. In short, Plaintiffs' price-related allegations do not support Article III standing.

Even assuming that the price allegations are not too speculative, they still do not succeed in establishing *parens*

*patriae* standing. In the first proposed scenario, Plaintiffs' egg farmers comply with the Shell Egg Laws to continue selling eggs in California. But, assuming that the farmers do not find other ways to cut their costs, and assuming further that they pass their increased costs on to Plaintiffs' consumers, our caselaw still holds that such allegations fail to support standing. In *Table Bluff*, we held that "no constitutional injury occurs when a manufacturer passes on higher costs in the form of price increases." 256 F.3d at 885. Although the plaintiffs in *Table Bluff* alleged due process violations, we have applied the same principle in a Commerce Clause case. We held that, although a law regulating firearms

> may tend to restrict supply, nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons. Under *Lujan*, plaintiffs' injury does not satisfy the requirements of Article III because it is "the result of the independent action of some third party not before the court."

*San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (brackets omitted) (quoting *Lujan*, 504 U.S. at 560). The "traceability" principle—that plaintiffs cannot allege standing from a speculative restriction in supply by predicting an eventual increase in price—applies here as well; the State of California will not increase egg prices for Plaintiffs' consumers.

The result in *Maryland v. Louisiana* is not to the contrary. There, explaining that a state "may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State *in a substantial way*," 451 U.S. at 737 (emphasis added), the Court found that the plaintiff states had alleged injury both to their proprietary

interests as gas consumers and to their citizens "from *substantial* economic injury presented by imposition of the First-Use Tax," *id.* at 739 (emphasis added). Plaintiffs do not allege a similarly substantial injury here. Natural gas is a commodity so universally critical to state governments, businesses, and ordinary consumers that the Supreme Court has twice granted *parens patriae* standing to challenge state actions that directly threaten shortages or price increases. *Id.*; *Pennsylvania*, 262 U.S. at 592 (describing a cut-off in gas as "a matter of grave public concern"). An ordinary consumer commodity, such as eggs, lacks the central economic significance to a state of a utility's product, such as natural gas.

In Plaintiffs' second proposed scenario, the egg farmers in Plaintiffs' states do not bring their farms into compliance with the Shell Egg Laws. If Plaintiffs' allegation correctly predicts that egg prices in the Midwest would drop due to excess supply, no ill effects for egg consumers would come to pass. Indeed, such a change would benefit Plaintiffs' consumers. It would be only egg farmers, not consumers, who might suffer an injury in that scenario. But, as we have explained, an injury to egg farmers alone is not sufficient to sustain *parens patriae* standing.

### 3. *Alleged Discrimination*

Finally, Plaintiffs' reliance on cases granting *parens patriae* standing to challenge discrimination against a state's citizens is misplaced. The Shell Egg Laws do not distinguish among eggs based on their state of origin. A statute that treats "both intrastate and interstate products" alike "is not discriminatory." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013).

In *Snapp*, Puerto Rico, acting as *parens patriae*, sued on behalf of its workers who allegedly suffered discrimination under a federal hiring program. The Court rejected "too narrow a view of the interests at stake." *Snapp*, 458 U.S. at 609. Although only 787 jobs were at issue, the nature of the discrimination affected all Puerto Ricans, so Puerto Rico could pursue relief for all residents under a *parens patriae* theory. *Id.* But *Snapp* does not assist Plaintiffs because there is no discrimination here, whether to the few or to the many. As noted, California egg farmers are subject to the same rules as egg farmers from all other states, including California itself.

*Georgia v. Pennsylvania R. Co.*, 324 U.S. 439 (1945), is no more helpful to Plaintiffs than is *Snapp*. There, Georgia sued a collection of southern railroads, alleging discriminatory price-fixing to the detriment of the entire economy of Georgia. The Court held that the State was not a mere nominal plaintiff, with "individual shippers being the real complainants." *Id.* at 452. Instead, the implications of price discrimination against Georgia-based commerce were "matters of grave public concern in which Georgia ha[d] an interest apart from that of particular individuals who may be affected," *id.* at 451, because rail rates "may arrest the development of a State or put it at a decided disadvantage in competitive markets," *id.* at 450. By contrast, Plaintiffs allege no trade barriers erected against their broader economies and, again, the Shell Egg Laws are not discriminatory. Accordingly, Plaintiffs' allegations of discrimination do not establish *parens patriae* standing.

B.  *Leave to Amend*

Plaintiffs urge us to reverse the district court's denial of leave to amend their complaint. They seek "[a]t the very least

. . . to plead the additional information [that they have] gathered since the Shell Egg Laws went into effect."**[3]** "Denial of leave to amend is reviewed for an abuse of discretion." *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011). "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Thinket Ink Info Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004). But a "district court does not err in denying leave to amend where the amendment would be futile." *Id.* (internal quotation marks omitted). An amendment is futile when "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). We find no abuse of discretion.

First, Plaintiffs cannot satisfy the requirements of standing by adding events that have occurred after the Shell Egg Laws took effect. "[S]tanding is determined as of the commencement of litigation." *Yamada v. Snipes*, 786 F.3d 1182, 1203 (9th Cir.), *cert. denied*, 136 S. Ct. 569 (2015) (internal quotation marks omitted); *accord D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). Plaintiffs brought this action *before* the Shell Egg laws took effect. Accordingly, later developments cannot save the complaint.

Second, Plaintiffs argue that certain allegations *were* available when the complaint was filed and that they should be allowed to include them now. In particular, Plaintiffs wish

---

**[3]** As construed by the district court and as argued on appeal, Plaintiffs seek to amend their complaint. They do not seek to supplement the pleadings pursuant to Federal Rule of Civil Procedure 15(d).

to allege that eggs are an important, affordable source of protein with which the Shell Egg Laws threaten to interfere, and that the threat of increased egg prices affects not just egg farmers, but also "grocers, bakers, and restaurant owners." Those allegations would still fail to establish standing because, at most, they allege a potential price increase for consumers *indirectly* resulting from the Shell Egg Laws. As noted earlier, our precedents hold that such speculative allegations are insufficient for *parens patriae* standing. *Table Bluff*, 256 F.3d at 885; *San Diego Cty. Gun Rights Comm.*, 98 F.3d at 1130. Plaintiffs also allege that the price of eggs might drop. Again, as discussed above, the contingent and uncertain nature of the alternatives available to plead when this complaint was filed are inadequate to support Article III standing.

In short, Plaintiffs would be unable to assert *parens patriae* standing in an amended complaint. The district court did not err by denying leave to amend.

## C. *Dismissal With Prejudice*

Finally, Plaintiffs argue that, because the district court dismissed the complaint for lack of subject matter jurisdiction, the dismissal should have been *without* prejudice. "We review for abuse of discretion a district court's decision to dismiss with prejudice." *Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012).

In general, dismissal for lack of subject matter jurisdiction is without prejudice. *See City of Oakland v. Hotels.com LP*, 572 F.3d 958, 962 (9th Cir. 2009) ("[F]ailure to exhaust administrative remedies is properly treated as a curable defect and should generally result in a dismissal without prejudice."); *Kelly v. Fleetwood Enters., Inc.*, 377 F.3d 1034,

1036 (9th Cir. 2004) (dismissing a complaint without prejudice when the amount in controversy requirement was not met); *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (order) ("Dismissals for lack of jurisdiction should be without prejudice so that a plaintiff may reassert his claims in a competent court." (internal quotation marks and ellipsis omitted)).  Exceptions to the general rule include dismissals on the ground of sovereign immunity, *Lake Wash. Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instr.*, 634 F.3d 1065, 1069 (9th Cir. 2011), and situations in which the plaintiff "could not have possibly amended his complaint to allege an injury in fact," *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 824 (9th Cir. 2002).

The theory undergirding the general rule is that "the merits have not been considered" before dismissal.  *Cooper v. Ramos*, 704 F.3d 772, 777 (9th Cir. 2012).  No recognized exception to that general rule applies here.  Plaintiffs have not satisfied the requirements of *parens patriae* standing.  But in theory, Plaintiffs could allege post-effective-date facts that might support standing.  As a result, the complaint should have been dismissed *without* prejudice.  *See City of Oakland*, 572 F.3d at 962 (affirming dismissal but remanding to dismiss without prejudice); *Kelly*, 377 F.3d at 1040 (affirming with instructions to enter order of dismissal without prejudice).

The judgment of the district court is **AFFIRMED** and the case is **REMANDED** with instructions to dismiss this action without prejudice.